**STATE of Tennessee**

**v.**

**Gregory Dwight BOWMAN.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Jan. 29, 2008 Session.

Jan. 14, 2009.

Application for Permission to Appeal Denied by Supreme Court June 15, 2009.

R. Jackson Rose, Harrogate, Tennessee (at trial); and Wesley D. Stone, Knoxville, Tennessee (at sentencing, motion for new trial, and on appeal), for the appellant, Gregory Dwight Bowman.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; William Paul Phillips, District Attorney General; and Jared Effler and Thomas E. Barclay, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and NORMA McGEE OGLE, JJ. joined.

In August 2005, a Claiborne County jury convicted the defendant, Gregory Dwight Bowman, of one count of aggravated vehicular homicide, a Class A felony; one count of vehicular homicide, a Class B felony; one count of vehicular assault, a Class D felony; one count of theft of property valued more than $1000, a Class D felony; and one count of driving on a revoked license, a Class B misdemeanor. The trial court merged the aggravated vehicular homicide and vehicular homicide convictions and sentenced the defendant to an effective sentence of twenty-four years in the Department of Correction as a Range I, standard offender. On appeal, the defendant argues that (1) the trial court erred by failing to suppress the defendant's blood sample, which was drawn shortly after the accident while he was unconscious; (2) the defendant was denied his right to a speedy trial; (3) the trial court erred by admitting the preliminary hearing testimony of a witness who died before trial; (4) the trial court erred by refusing to admit a prior inconsistent statement by the deceased witness; (5) the trial court erred by failing to instruct the jury regarding accomplice testimony; (6) the evidence produced at trial was insufficient to convict the defendant of vehicular assault, aggravated vehicular homicide, and theft; and (7) the trial court imposed an excessive sentence. After reviewing the record, we conclude that the trial court committed error as to the defendant's fourth issue, but such error was harmless. We also conclude that the trial court committed no error as to any other issues and therefore affirm the judgments of the trial court.

*Testimony from Hearing on Motion to Suppress Defendant's Blood Alcohol Test*

Trooper Eric Phillips with the Tennessee Highway Patrol (THP) testified that on the evening of October 16, 2004, he was

dispatched to an accident on State Route 33 in Claiborne County. Upon arriving at the accident scene, he saw on the roadway a white Toyota pickup truck pulling a utility trailer, while a black Chevrolet car and a red Dodge pickup truck had gone over the embankment on the northbound side of the roadway and were "off in the woods next to the lake bottom." Trooper Phillips was initially unaware of the injuries to the occupants of the Chevrolet, Jeffrey Allen and Robin Baker, but he later learned that Allen suffered severe head trauma and Baker had some "incapacitating injuries," the exact nature of which the trooper did not know at the scene. The trooper testified that Dr. Fejeran, who had happened upon the scene and who had assisted EMS workers in treating the victims, informed him that Allen had died of his injuries.

Although Trooper Phillips testified on cross-examination that he did not go down the embankment to where the Dodge and Chevrolet were located, on direct examination he testified that he was able to see two persons in the Dodge truck: Kimberly Branum[1] was in the passenger seat, and the defendant, Gregory Bowman, was "several feet in the woods to the right of the truck," lying under a tree. The trooper testified that the defendant was eventually brought on a backboard onto the roadway and into an ambulance. As the defendant was carried past the trooper, the trooper noticed the odor of alcohol on the defendant. Trooper Phillips did not ask the defendant any questions on the scene because the defendant appeared to be unconscious. Trooper Phillips testified that his on-the-scene investigation led him to believe that the Dodge truck, traveling southbound on Highway 33, crossed the

center line, hit the Toyota truck driven by Noah Riggs, then hit the black Chevrolet head-on in the northbound lane.

Trooper Phillips testified that he instructed another trooper on the scene, Bobby Morlock, to take a blood sample from the defendant, which would later be tested for blood alcohol content. Trooper Phillips said that he had the blood drawn on the scene because he arrived at the crash scene around 7:50 p.m. and that, at that hour, no judge would be available to sign a warrant authorizing the police to draw the defendant's blood.

On cross-examination, Trooper Phillips testified that he did not go down the embankment to reach the occupants of the Chevrolet and the Dodge because emergency workers were already tending to them. He said that when the emergency workers brought the defendant onto the roadway, he got close enough to the defendant so that he could smell the odor of alcoholic beverages on the defendant. Trooper Phillips said that he decided to test both Branum's and the defendant's blood, although the trooper said that the defendant was driving the Dodge truck. On redirect, Trooper Phillips said that was within three feet of the defendant when he smelled the alcoholic beverages on his person.

THP Trooper Bobby Morlock testified that when he arrived at the accident scene, Trooper Phillips was already present. Trooper Phillips instructed Trooper Morlock to have the defendant's blood drawn. Trooper Morlock testified that Dr. Fejeran drew the defendant's blood and that he then turned the blood sample over to

---

1. Throughout most of the record, this name is spelled "Branham." However, in a statement given to Trooper Tim Ryan of the Tennessee Highway Patrol, Ms. Branum signed her name as it appears above. Additionally, the defendant, in his brief, spells Ms. Branum's name as it appears above, and this spelling appears on the indictment. Accordingly, we will use this spelling in this opinion.

Trooper Phillips. On cross-examination, Trooper Morlock said that upon arriving at the scene, he had no idea as to who had been drinking and that he did not make any contact with the defendant.

At the conclusion of the hearing, the trial court denied the defendant's motion to suppress the blood alcohol test. The case then proceeded to trial.

### Trial Testimony

Noah Riggs testified that on the evening of October 16, 2004, he was driving a white Toyota pickup truck northbound on State Highway 33 in Claiborne County, returning home after a day of hunting at the Chuck Swan Wildlife Management Area. Riggs, who was accompanied in the vehicle by his wife, was pulling a twelve-foot trailer, upon which was a 2002 Honda four-wheeler. While driving up a hill, he saw a red Dodge pickup truck in the southbound lane round a curve and head into the northbound lane. Riggs pulled over as far as he could in an attempt to avoid an accident, but the other truck hit the side of Riggs's truck behind the driver's side door. Riggs and his wife were not injured in the accident, though his truck, trailer, and four-wheeler were damaged. Riggs testified that he had not consumed any alcohol during the day, and while he had smoked marijuana a week before the accident, that drug use did not affect his ability to drive the day of the accident. On cross-examination, Riggs said that he could not determine who was driving the red Dodge truck.

Dr. Ronald Fejeran, an osteopathic physician, testified that he happened upon the accident scene while driving from Maynardville toward Tazewell. He exited his vehicle and initially encountered Mr. and Mrs. Riggs, as their truck was still on the roadway. After determining that there were no problems with the Toyota's occupants, Dr. Fejeran was informed that there were other people involved in the accident who were at the bottom of an embankment. Dr. Fejeran went to the bottom of the embankment, where he first approached the Chevrolet. Both of that car's occupants were in the front passenger seat. Baker was positioned against the dashboard, complaining of leg pain. Allen was lying down on his side with his head behind Baker's back. Dr. Fejeran noticed blood "all over" Allen's mouth, and he also saw "smoke coming out of his mouth, like condensation in the fog." Emergency workers eventually extracted Baker and Allen from the vehicle. Dr. Fejeran intubated Allen, but once the emergency workers determined that he had no heart rate, Dr. Fejeran pronounced Allen dead. After Dr. Fejeran offered this testimony, the parties stipulated that the direct and proximate cause of Allen's death was the injuries he sustained in the accident.

Dr. Fejeran testified that when Baker was placed in an ambulance, she seemed stable, so the doctor then asked the troopers if anyone else was involved in the accident. Dr. Fejeran was initially told that nobody else could be found, but the doctor was later informed that other people had in fact been involved in the accident. Dr. Fejeran was then directed toward the defendant, who had been placed in an ambulance. The physician said that when he approached the defendant, he could smell alcohol on the defendant's person. Dr. Fejeran said that the troopers asked him to draw the defendant's blood. Thus, after a person in the ambulance placed a needle in the defendant's vein, Dr. Fejeran acquired a syringe and withdrew the defendant's blood. The physician then gave the blood sample to a state trooper. On cross-examination, Dr. Fejeran said

that he did not draw anyone else's blood at the accident scene.

Trooper Morlock's trial testimony repeated the substance of his suppression hearing testimony, with some additions. Trooper Morlock said that when he arrived at the accident scene, he saw a red pickup truck and a small black automobile at the bottom of a steep embankment. He also saw the defendant lying on his side some distance away from the truck. According to the trooper, a tree was positioned between the truck's resting place and the spot where the defendant was located. Trooper Morlock said that Trooper Phillips instructed him to take blood samples from the defendant, Branum, and Allen. The trooper testified that Dr. Fejeran took the defendant's blood at the scene, while Branum's and Allen's blood samples were taken at the Claiborne County Hospital emergency room. On cross-examination, the trooper said he did not go to the bottom of the embankment to check on the vehicles or their occupants because emergency workers were already present. Trooper Morlock said that he spoke to Branum at the accident scene and that he inspected two bags which Branum retrieved from the truck following the accident. On redirect, Trooper Morlock said that one of the bags contained men's clothes and feminine hygiene products, and the other bag contained women's clothes.

Trooper Phillips's trial testimony also repeated the substance of his suppression hearing testimony, with some additions. Trooper Phillips said that he observed Branum in the truck's passenger seat and the defendant lying at the foot of a tree some distance away from the truck. He also saw beer cans scattered inside the passenger compartment, and he also noted clothes piled atop the armrest between the driver's and passenger's seats. In a departure from his preliminary hearing testimony, the trooper testified that he did go to the bottom of the embankment and observe the truck there, although it is unclear from Trooper Phillips's testimony whether he made contact with either the defendant or Branum at the bottom of the embankment. It is also unclear whether the trooper searched the vehicle at the bottom of the embankment or when the truck was brought back onto the roadway.

The trooper noted that he sent blood samples from Allen, Riggs, the defendant, and Branum to the Tennessee Bureau of Investigation (TBI) lab for analysis. He testified that the defendant's blood was drawn at the scene, while Branum's and Riggs's samples were taken at the Claiborne County Hospital emergency room. Trooper Phillips testified that Allen's blood was drawn at the scene.

On cross-examination, Trooper Phillips said that no license plate number was listed for the Dodge on his accident report. The trooper also said, in a departure from his preliminary hearing testimony, that he could not say with any certainty who was driving the Dodge truck at the time of the accident. The trooper said that no fingerprints were taken from inside the truck or the door handle and that no blood was visible in the vehicle. He noted that he did not speak with the defendant, but he did speak with Branum, and based on this conversation, the trooper noted that it appeared Branum had been drinking. Trooper Phillips said he did not order a blood test for the passengers in the Chevrolet or the Toyota truck, although he could have done so. On redirect, the trooper said that the defendant could not walk after the accident, but Branum could walk.

Three employees with the TBI Crime Lab then testified as to the drug and alcohol tests that were performed on the blood samples taken from the defendant,

Branum, Allen, and Riggs shortly after the accident. Forensic scientist Melanie Carlisle said that she tested the defendant's blood sample and that defendant's blood alcohol content was 0.30%. On cross-examination, she said that the defendant's blood tested negative for THC, cocaine, opiates, and other drugs. Toxicologist Margaret Massengill testified that she tested the blood samples of Riggs, Allen, and Branum for blood alcohol content. Branum's blood alcohol content was 0.18%, while Allen's and Riggs's samples both tested negative for alcohol. Forensic scientist Stephanie Dotson testified that Riggs's blood tested positive for marijuana metabolite, which indicated that Riggs had previously smoked marijuana and that his blood was in the process of breaking down the marijuana into a metabolite at the time of the accident. Dotson said that the test results did not indicate when Riggs used marijuana or how much he used at the time. Dotson said that Allen's blood tested negative for marijuana and all other drugs, and that Branum's blood tested positive for marijuana metabolite and benzodiazepines.

Following Dotson's testimony, the parties stipulated that the defendant was driving on a revoked license on October 16, 2004, the date the accident occurred.

Trooper Todd Loveday testified that he was employed as an accident reconstructionist with the Tennessee Highway Patrol. Trooper Loveday testified that he investigated this accident as part of his duties, and his investigation led him to conclude that the accident occurred as follows:

> [T]he Dodge pickup was rounding the slight curve, the Dodge crossed the center of the roadway, sideswiped the Toyota pickup, continued to do more damage down the side of the Toyota pickup as it's—then struck the trailer being pulled

by the Toyota pickup, causing damage to the Dodge. The Dodge then began to skid to impact with the Chevrolet, which was traveling northbound. The impact occurred. Both impacts occurred in the northbound lane.

John Sanders testified that on the date of the accident, he was traveling northbound on Highway 33 behind Riggs's Toyota and Allen's Chevrolet when another vehicle headed southbound sideswiped the Toyota and hit the Chevrolet head-on. The other vehicle and the Chevrolet then went down the highway's embankment. After the accident, Sanders realized that the other vehicle involved in the accident was a red Dodge pickup truck. On cross-examination, Sanders admitted that he could not identify who was driving the Dodge truck.

Trooper Tim Ryan with the Tennessee Highway Patrol's Criminal Investigations Division testified that he interviewed the defendant at the University of Tennessee (UT) Medical Center on October 18, 2004, two days after the accident occurred. According to Trooper Ryan, the defendant said that the day the accident occurred, he and a man named Irwin spent the day together before Irwin dropped off the defendant at the residence of his aunt, Barbara Smith. The defendant said that he left the house after he got into an argument with his aunt. He walked down Lone Mountain Road in an attempt to hitch a ride when a red Dodge pickup truck driven by a man named Gary picked up the defendant. The defendant told the trooper that he remembered little of what happened next, other than he was involved in an accident. The defendant told the trooper that he had consumed four or five beers during the course of the day. Trooper Ryan then wrote out the statement and attempted to have the defendant sign it, but the defendant refused, saying

that he did not want to get Gary into trouble. Trooper Ryan testified that despite his investigation, he was never able to identify or locate "Gary."

Over the defendant's objection, the preliminary testimony offered by Branum, who died prior to trial, was read into evidence. At the preliminary hearing, Branum testified that on the day of the accident, she was with a man named Mike Atkinson when the two got into an argument at a gas station somewhere in Claiborne County. Branum said that the defendant "got [Atkinson] off me," at which point Atkinson left and Branum got into the defendant's red pickup truck. Branum said that the defendant, who drove, stopped at a residence, went inside, then returned to the truck, at which point he continued driving. Branum said that during the time she was a passenger in the defendant's truck, she and the defendant both drank Natural Ice beer, with the defendant drinking "maybe two beers" during that time.

According to Branum, the defendant's driving was mostly "fine," but her judgment may have been impaired because she was "night blind" and could not see after dark, and she had been drinking. Branum said that after the defendant had driven a while, his truck came around a curve and hit a car, after which the truck slid down the embankment. Branum said that she was knocked out, and when she awoke, the defendant was out of the truck. She suggested that perhaps the defendant had been thrown from the truck after the accident.

On cross-examination, Branum said that she did not know whether the defendant or the other vehicle was on the wrong side of the road at the time of the accident. Branum insisted that she was not driving the truck that night because she did not have a driver's license.

TBI forensic scientist Elizabeth Reed testified that she examined the Dodge truck for usable fingerprints but could not find any.

Bill Evans testified that he owned a red Dodge Ram 1500 regular cab pickup truck. In October 2004, he and his brother, Ricky Bridges, were at a sports bar in Knoxville when Evans sent Bridges to the truck to retrieve some cigars. Bridges returned to the bar and informed Evans that his truck had been stolen. Later that month, Evans received a telephone call informing him that his truck had been involved in a motor vehicle accident.

Evans said that he owned a heating and air conditioning business and that Bridges worked for him. Evans said that the defendant, whose sister was married to Bridges, worked for both Bridges and Evans. Evans said that he knew the defendant as "Garfield." Evans said that nobody, including the defendant, had permission to use the truck the night it was stolen. On cross-examination, Evans said that the defendant still worked for him and his brother. He also admitted that he, his brother Donnie, and Bridges each had a red truck and that the three trucks looked alike. On redirect examination, Evans said that his truck was valued between $8000 and $9000 before the accident.

Peggy Shelton testified that she dated and lived with the defendant in August and September 2004. Shelton said that at some point in October 2004, the defendant came to her house, where they had lived, to retrieve some belongings. At the time, the defendant drove a red, single-cab Dodge pickup truck. Shelton said that the defendant asked her to drive him to the residence where Bridges, his brother-in-law, lived. Shelton did so, driving her truck. After a fifteen to twenty minute

visit, the defendant and Shelton returned to Shelton's residence, and the defendant left, driving the red Dodge truck.

Shelton testified that a few weeks later, the defendant contacted her and told her that he had been involved in an automobile accident. Shelton told the defendant that he was in a lot of trouble, to which the defendant replied, "Yes, I know." Shelton then told the defendant, "Hopefully, they won't do anything to the people that own the truck you borrowed." The defendant replied that the truck was stolen. On cross-examination, Shelton said that she knew that Bridges owned a red Dodge truck but that the truck the defendant was driving the day she saw him was not Bridges' because she saw Bridges' truck in his driveway. According to Shelton, she asked the defendant who owned the truck he was driving. The defendant did not identify the owner but merely stated that the truck had been borrowed. Shelton admitted that at the preliminary hearing, she was unable to say whether the truck was a standard cab or an extended cab, but she was now certain that the truck was a standard cab truck.

Robin Baker testified that she was the passenger in the black Chevrolet Aveo involved in this accident. On the day of the accident, she and Allen went shopping at the Knoxville Center Mall then drove back toward Middlesboro, Kentucky, where they lived. During the drive back, Baker fell asleep, and the next thing she knew, she was being told by emergency workers that she was hurt, needed to stay still, and had to stay awake. Baker said that as a result of the accident, she suffered facial scars, a broken nose, a broken neck, a lacerated liver, and a fractured kneecap. After Baker's testimony, the parties stipulated that the injuries Baker suffered as the direct and proximate result of the au-

tomobile accident constituted serious bodily injury.

Libby Bridges, the defendant's sister, testified for the defendant. She said that she interacted with Branum over a two-week period before the accident. She said that Branum picked up the defendant from Bridges' home every evening, after the defendant had returned home from work, during that period. Bridges said that Branum would usually not come to the house to pick up the defendant, but Branum instead waited on a hill near the house. According to Bridges, Branum came to the house once and waited on the porch. On that occasion, Branum fell off the porch, which led Bridges to tell Branum to "go back to wherever she came from." Bridges said that the defendant and Branum were "seeing each other" during this period. On cross-examination, Bridges said that the defendant had been dating Peggy Shelton during August and September 2004. She also said that the defendant had access to the truck which was involved in the accident. Bridges said that she was aware that the defendant did not have a valid driver's license at the time of the accident.

Lindsay Perez testified that she worked at a convenience store as a cashier. She said that Branum and the defendant visited her store two or three times in the week to ten days before the accident; each time the two arrived, they arrived in a red Dodge truck driven by Branum. Perez said that Branum's reputation for veracity "wasn't very good," noting that Branum had been banned from the store for shoplifting, that Branum "drank way too much," and that she had thrown Branum off her property for using drugs in front of Perez's grandson. On cross-examination, Perez said that the defendant had not indicated where the red pickup truck had

come from, but she had not asked the defendant about the truck either.

The defendant recalled Troopers Phillips and Ryan to testify. Trooper Phillips testified that during his investigation, he did not look for Mike Atkinson or Terry Roark. Trooper Ryan testified that he took a statement from Branum at 1:55 a.m. the day after the accident, while she was in the Claiborne County Hospital. Trooper Ryan then read the statement, which the trial court instructed could be used for the sole purpose of impeaching Branum's preliminary hearing testimony:

Ms. Branham [sic] states that on Saturday, 10–16–04, at approximately 6:30 to 7:00 o'clock p.m., she was at a service station in Harrogate, Tennessee, with her boyfriend, Mike Atkinson. Ms. Branham [sic] states that she and Michael got into an argument while they were traveling from Harlan, Kentucky, in [sic] route to Maynardville, Tennessee. Ms. Branham [sic] states that she pulled over at a service station in Harrogate to use the rest room. She states that Michael went into the service station and bought a beer while she went to the rest room.

Ms. Branham [sic] states that upon exiting the store, she and Michael got into a physical argument in the parking lot. She states Michael grabbed her hair, and an unknown gentleman grabbed Michael on the shoulder and told him to leave her alone. Ms. Branham [sic] states that Michael left the parking lot in his maroon Ford Taurus.

Ms. Branham [sic] states that this unknown gentleman asked her if she needed a ride, and she stated to him that she was going to Maynardville. Ms. Branham [sic] states that . . . she left the parking lot headed toward Maynardville.

Ms. Branham [sic] states that . . . the gentleman introduced himself as "Garfield." Ms. Branham [sic] states that they made small talk through Tazewell, and the only thing she remembers about the accident was emergency personnel helping her up an embankment.

She states that Garfield was driving somewhat fast . . . at times and did not appear to be driving erratically. She states she did, however, tell him to slow down once. Ms. Branham [sic] states that while she was in the red truck, Garfield did not appear to be intoxicated, nor did she smell any alcohol. Ms. Branham [sic] states that just prior to the accident she remembered Garfield leaning over to turn up the radio volume.

Ms. Branham [sic] states that this incident was the first time she had ever seen or met Garfield.

Trooper Ryan testified that she attempted to locate Atkinson but was unable to do so. He also said that he looked at surveillance videos from certain convenience stores near the Lincoln Memorial University campus in Harrogate, but none of the videos depicted any altercations in the stores' parking lots. However, the trooper noted that some of the convenience stores did not have surveillance videos for him to view.

The defendant also recalled Trooper Morlock, who said that he also took a statement from Branum at the Claiborne County ER the night of the accident. In this statement, Branum said that she rode from Kentucky with a man named Terry Roark, and that after she and Roark got into an altercation, she exited Roark's truck at a store somewhere in Tennessee. Upon entering the store, Branum asked a man, whom she identified as "Garfield," whether he knew where Maynardville was. The man told Branum that he knew where Maynardville was and that he would take her there. At that point, Branum got into

the man's truck, an event which Roark viewed. Branum told Trooper Morlock that the other man was "going real fast in the truck" and that the driver's speed "scared me several times." Trooper Morlock said that he did not attempt to locate Roark during the course of his investigation. On cross-examination, Trooper Morlock said that Branum's statement did not mention anything about stopping at a gas station or stopping to buy beer.

Deputy Brandon Smith with the Union County Sheriff's Office testified that on November 10, 2004, he served a subpoena on Branum. At that time, Branum made a statement to Deputy Smith. The defendant attempted to have Deputy Smith testify regarding that statement, but on objection by the state, the trial court ruled that the deputy's testimony regarding Branum's statement was inadmissible.

Barbara Smith, the defendant's aunt, testified that on the day of the wreck, the defendant and Branum arrived at her house. Smith said that Branum "burst[ ] through the door, very rude[ly], and introduced herself." The defendant and Branum stayed at Smith's residence thirty to forty minutes before leaving, with Branum driving away in a red pickup truck. Smith testified that she only saw the defendant drinking at her residence; while she did not specifically state whether the defendant was intoxicated when she saw him, she indicated that Branum appeared to be intoxicated. Smith also testified that she had not seen the defendant driving a red pickup truck before the day of the accident. On cross-examination, Smith admitted that she had a pending charge for attempting to pass a bad check in the amount of $10 at a local convenience store.

Paula England, the defendant's sister, testified that she saw Branum "a couple times" before the accident, once while driving on Western Avenue in Knoxville and once while waiting in the driveway of her house. England said that both times, Branum was driving. On cross-examination, England said that Branum was driving a red truck. England said that her brother-in-law, Ricky Bridges, had a red truck, but she was unaware that the vehicle was stolen at the time she saw Branum driving the truck. England admitted that she told the defendant not to speak to the police when she spoke to him on the telephone after the accident.

Bill England, Paula England's husband, testified that he saw Branum and the defendant together several times before the accident. Each time England saw the two together in a red Dodge pickup truck, Branum was driving.

The defendant testified that he met Branum two to three months before the accident. He said that one day, he and Branum were drinking when he and Branum decided to go to Friends Bar and Grill and take Bill Evans' truck. The defendant said he was working for Ricky Bridges at the time, that Bridges was subcontracting with Evans, and that he "knew where [Evans] kept a key hidden" for the truck. The defendant said that after he "sobered up," he came to regret his decision, but he was too scared to take the truck back to Evans. Therefore, he kept the truck during the day while he was at work, and while he was not at work, he and Branum attempted to keep the truck hidden from Evans and Bridges. To keep the truck hidden from his employer, Branum would drop off the defendant at a supermarket across the street from Bridges' subdivision, and the defendant would then walk to Bridges' house, where the two men would then leave for work. When Branum came to Bridges' house to pick up or drop off the defendant, she was driving a blue truck, not the red truck she and the defendant had taken from Evans. The defendant

also said that he and Branum removed the assigned license plate from the truck and replaced it with a plate from another vehicle.

The defendant testified that on the morning of the accident, he and Branum left a friend's house at 9:00 a.m., with the defendant driving. He said that because it was raining, he knew he would be unable to work, and therefore he was initially confused about how to spend his time. He initially went to Dean Hickman's house, but finding that Hickman was not at home, they went to a convenience store near the Claiborne County/Union County line, where they purchased some beer. They then went to Mike Hickman's house, but finding nobody home, they went to a house where the defendant's friend Toby lived, and at that point they picked up some moonshine whiskey. They then returned to Mike Hickman's house, and finding that Hickman had returned home, they stopped, ate, and showered. The defendant and Branum then left and went toward Barbara Smith's house, this time with Branum driving. Finding that Smith was not at home, they then went toward Carol Rouse's house, with Branum still driving. The defendant did not remember what happened after that; the next thing he remembered was being at UT Hospital.

The defendant testified that both he and Branum had been drinking before the accident. The defendant reiterated that while he did not remember being in the accident, he was not driving at the time of the accident. He also noted that he still worked for Evans and Bridges.

On cross-examination, the defendant admitted that his driver's license was suspended the day of the accident and that he had taken Evans' truck without his permission. He also admitted that shortly after the accident, he had told Trooper Ryan that "some mystery person" picked him up on Highway 33 before the accident and that he had told the trooper that he drank four or five beers the day of the accident. He said that although he drank moonshine that day, he did not relate this fact to Trooper Ryan because the trooper did not ask him if he had been drinking moonshine. He also admitted that he told Shelton that the truck that was involved in the accident had been stolen. The defendant insisted that he was not driving the truck at the time of the accident. While he admitted that the truck sustained more damage on the driver's side than on the passenger's side, he said that Branum's injuries were not as severe as were his because the air bag prevented Branum from hitting the dashboard. The defendant testified that did not have any air bag burns on his person.

The defendant also admitted that while both he and Branum drank alcohol on the day of the accident, he permitted Branum to drive the truck. The defendant also admitted to being convicted of passing a worthless check on June 3, 2005. On redirect, the defendant said that Branum visited him at the hospital and told him what she would say about the accident to police. According to the defendant, Branum insisted that he "go along" with her version of events so as to keep them out of trouble.

At the conclusion of the proof, the jury found the defendant guilty of one count of aggravated vehicular homicide, one count of vehicular homicide, one count of vehicular assault, one count of theft of property valued over $1000, and one count of driving on a revoked license. The trial court merged the two vehicular homicide convictions and sentenced the defendant to an effective sentence of twenty-four years in prison. This appeal follows.

### I. Motion to Suppress Results of Defendant's Blood Test

■ The defendant argues that the trial court erred by denying his motion to sup-

press the results of the testing conducted on the defendant's blood, which was taken at the accident scene. We disagree.

### Standard of Review

A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn.1998); *State v. Perry*, 13 S.W.3d 724, 737 (Tenn.Crim.App. 1999). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." *Odom*, 928 S.W.2d at 23. Furthermore, an appellate court's review of the trial court's application of law to the facts is conducted under a de novo standard of review. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn.2001).

Both the federal and state constitutions offer protection from unreasonable searches and seizures. *See* U.S. Const. amend. IV, Tenn. Const. art. I, § 7. "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971) (quoting *Katz v. United States*, 389

U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)); *see also State v. Berrios*, 235 S.W.3d 99, 104 (Tenn.2007). "Exceptions to the warrant requirement include searches incident to arrest, plain view, hot pursuit, exigent circumstances, and others, such as the consent to search." *Berrios*, 235 S.W.3d at 104 (citing *State v. Cox*, 171 S.W.3d 174, 179 (Tenn.2005)). Fourth Amendment concerns attach to "all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975); *see also Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). Our supreme court has specifically held that "[a defendant's] blood draw and its subsequent analysis are both subject to the constitutional limitations imposed by the Fourth Amendment." *State v. Scarborough*, 201 S.W.3d 607, 616 (Tenn.2006).

Another exception to the general rule that warrantless searches and seizures are per se unreasonable arises in situations such as the one presented in this case. Tennessee's criminal code provides that "[a]ny person who is unconscious as a result of an accident or is unconscious at the time of arrest or apprehension or otherwise in a condition rendering that person incapable of refusal, shall be subjected to" blood alcohol content testing, "but the results thereof shall not be used in evidence against that person in any court ... without the consent of the person so tested." Tenn.Code Ann. § 55–10–406(b) (2006). However, in cases where the defendant is prosecuted for aggravated assault or vehicular homicide, the results of a compelled blood alcohol test may be admitted if the test results were "obtained by any means lawful." *Id.* § (d). This court, adopting the test established by the Supreme Court in *Schmerber v. California*, 384 U.S. 757,

86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), has held that for a compelled blood alcohol test to be admissible, the state must prove by a preponderance of the evidence that:

(a) The officer compelling the extraction of blood from the accused has probable cause to believe that the accused committed the offense of aggravated assault or vehicular homicide while under the influences of an intoxicant or drug, and there is a clear indication that evidence of the accused's intoxication will be found if the blood is taken from the accused's body and tested;

(b) Exigent circumstances exist to forego the warrant requirement;

(c) The test selected by the officer is reasonable and competent for determining blood-alcohol content; and

(d) The test is performed in a reasonable manner.

*State v. Jordan*, 7 S.W.3d 92, 99 (Tenn. Crim.App.1999).

Regarding the first *Jordan* factor, at the suppression hearing Trooper Phillips testified that upon arriving at the scene, he observed a white Toyota truck in the northbound lane of Highway 33 and two other vehicles, a black Chevrolet car and a Red Dodge pickup truck, at the bottom of an embankment beneath the northbound lane. The trooper discovered the defendant lying under a tree at the bottom of an embankment, outside the driver's side of the truck, and he observed another person, later identified as Branum, in the truck's passenger seat. The trooper testified that he came within three feet of the defendant once the defendant was strapped to a backboard and brought up to the roadway. At that time, the trooper noticed the smell of alcoholic beverages on the defendant, who appeared to be unconscious. Before the defendant was taken from the scene, Trooper Phillips learned that Allen, one of the occupants of the Chevrolet, had been pronounced dead. Based on this evidence, the trooper had probable cause to suspect that the defendant had been driving the truck at the time of the accident and had committed vehicular homicide. The trooper also had probable cause to suspect that the defendant committed the offense while under the influence of alcohol, and there was a clear indication that a blood test would indicate that the defendant was in fact intoxicated.

Regarding the second factor, Trooper Phillips testified that he arrived at the accident scene around 7:50 p.m. and remained there for several hours. The trooper stated that at that late hour, no judge would be available to issue a search warrant. Additionally, the police needed to obtain a blood sample from the defendant before the alcohol in his blood metabolized. *See State v. Jeffrey E. Copeland*, No. W2000–00346–CCA–R3–CD, 2001 WL 359235, at *9 (Tenn.Crim.App., at Jackson, April 9, 2001) (finding that exigent circumstances existed based on concerns regarding destruction of evidence, noting that "the percentage of alcohol in a person's blood begins to diminish shortly after a person's last drink"). Furthermore, in his brief the defendant "avers that he cannot challenge the findings by the trial court or this court regarding the [existence of] exigent circumstances." As such, we conclude that exigent circumstances existed which precluded the police from obtaining a warrant for the defendant's blood.

We note that evidence regarding the third and fourth *Jordan* factors was not introduced at the suppression hearing. However, our supreme court has held that "if proof adduced at trial establishes a lawful search or seizure, the evidence should not be excluded simply because the proof at the suppression hearing did not establish its legality." *Henning*, 975 S.W.2d at 299. At trial, Trooper Morlock

testified that he instructed Dr. Fejeran to extract the defendant's blood. Dr. Fejeran, while not inserting the needle into the defendant's arm himself, witnessed one of the workers inside the ambulance in which the defendant was being treated for his injuries insert a needle into the defendant's arm. Dr. Fejeran then extracted the defendant's blood and transferred it to the troopers. Agent Carlisle from the TBI testified that she received the blood sample from Trooper Phillips and performed a blood alcohol test on the sample, which revealed its blood alcohol content (BAC) to be 0.30%. Based on this evidence, we conclude that the last two *Jordan* factors were met, as the extraction process and BAC test were reasonable and competent for establishing the defendant's BAC and were both carried out in a reasonable manner. Concluding that the trial court did not err in denying the defendant's motion to suppress his blood sample, we deny the defendant relief on this issue.

## II. Right to Speedy Trial

■ The defendant next argues that he was denied his right to a speedy trial. The record reflects that the accident occurred on October 16, 2004; the defendant was arrested three days later and was indicted on December 7, 2004. The defendant's trial was originally set to begin on April 18, 2005, but because a trial in another matter ran longer than expected, the trial court postponed the start of the trial two days. On April 18, Noah Riggs, one of the drivers involved in the accident, notified the District Attorney General's office about another potential witness to the accident. According to Riggs, this person, a hunter from Greeneville, potentially had information regarding "the whereabouts of certain parties immediately after the collision." This individual was not listed on the THP's accident report. On April 19, the prosecutor told the trial court about the potential witness. The prosecutor said that after speaking with Riggs, he contacted the Tennessee Wildlife Resources Agency (TWRA), which provided a list of people who had hunted at Chuck Swan that day. The prosecutor said that the state needed the continuance so that his office could contact the persons from that list in hopes of identifying the potential witness. The defendant objected to any additional delay in the proceedings, but the trial court granted a continuance until August 11, 2005, and lowered the defendant's bond from $100,000 to $10,000 as a remedy to the continued incarceration.

■ Once the state initiates criminal proceedings, the right to a speedy trial is implicated pursuant to the Sixth Amendment to the United States Constitution and to article 1, section 9 of the Tennessee Constitution. *See* Tenn.Code Ann. § 40–14–101 (2006); Tenn. R.Crim. P. 48(b). The right is meant to protect the defendant "against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." *State v. Utley*, 956 S.W.2d 489, 492 (Tenn.1997). In *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), the Supreme Court devised a balancing test to determine speedy trial issues and identified the following factors for consideration:

(a) The length of delay;

(b) The reason for the delay;

(c) The defendant's assertion of his right to a speedy trial; and

(d) The prejudice to the defendant.

*See also State v. Bishop*, 493 S.W.2d 81, 84–85 (Tenn.1973) (implicitly adopting the *Barker* balancing test for our state's constitutional and statutory right to a speedy trial). The remedy for the denial of a speedy trial is dismissal of the charges.

*Strunk v. United States,* 412 U.S. 434, 439, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56 (1973).

 The first *Barker* factor, length of delay, is a threshold factor, serving as the triggering mechanism that will necessitate consideration of the other three factors. *Barker,* 407 U.S. at 530, 92 S.Ct. 2182. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* Generally, "a delay must approach one year to trigger the *Barker v. Wingo* analysis," although "the line of demarcation depends on the nature of the case." *State v. Utley,* 956 S.W.2d 489, 494 (Tenn.1997); *see Doggett v. United States,* 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 2691 n. 1, 120 L.Ed.2d 520 (1992). Here, the defendant was tried within ten months of the accident which led to this case. As such, this factor weighs in the state's favor. Although the holdings of *Barker, Utley,* and related cases indicate that we need not consider the other three factors, we will do so as to not pretermit this issue as raised by the defendant.

In this case, the record reflects that the defendant objected to the state's motion for a continuance and requested that the trial proceed on the scheduled starting date of April 20. As such, the third *Barker* factor weighs in the defendant's favor. The other two factors, however, do not. Regarding the second factor, reason for delay, our supreme court has noted that for purposes of speedy trial analysis, trial delays can be categorized as follows:

(a) Intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant;

(b) Bureaucratic indifference or negligence;

(c) Delay necessary to the fair and effective prosecution of the case; and

(d) Delay caused, or acquiesced in, by the defense

*State v. Wood,* 924 S.W.2d 342, 346–47 (Tenn.1996). In this case, the state moved for a continuance on April 19 after being informed by Riggs, who apparently arrived at court for the original April 18 trial date, about the existence of another possible witness to the accident, one who had not been previously identified. Given this development, the continuance granted by the trial court was a reasonable delay that was "necessary to the fair and effective prosecution of the case." Although this type of delay is not weighed against either party, *see id.* at 347, the delay was not detrimental to the defendant.

The fourth *Barker* factor, prejudice, has been described by the Tennessee Supreme Court as "the single most important factor in the balancing test." *State v. Baker,* 614 S.W.2d 352, 356 (Tenn.1981). "Prejudice . . . should be assessed in the light of the interests of the defendants which the speedy trial right was designed to protect," which the Supreme Court identified as: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker,* 407 U.S. at 532, 92 S.Ct. 2182. The Court noted that "the most serious [of these interests] is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* In this case, the defendant argues that he suffered prejudice because Branum died during the continuance period, and therefore he was denied the opportunity to confront and cross-examine her. Although the defendant did cross-examine Branum during the preliminary hearing, the defendant argues that this cross-examination was inadequate given the limited purpose of the preliminary hearing, the fact that counsel was appointed five minutes before the preliminary hearing, and the inability of de-

fense counsel to gain access to two prior inconsistent statements Branum gave to police before the hearing.

In *Barker*, the Supreme Court held that "[i]f witnesses die or disappear during a delay, the prejudice is obvious." *Id.* Thus, we can reasonably conclude that Branum's death during the delay in this trial caused the defendant some prejudice. However, the level of prejudice the defendant suffered was not significant enough to warrant reversing the defendant's convictions. As stated above, the defendant did cross-examine Branum during the preliminary hearing, and, while trial counsel was retained shortly before the preliminary hearing began, the transcript of the hearing reflects that counsel did not request a continuance or express any concerns about his ability to cross-examine Branum or any other witness. Regarding Branum's prior inconsistent statements, two of the statements were introduced at trial for impeachment purposes. As examined below, the trial court excluded a third statement, and while that ruling was error, such error was harmless. The defendant also presented the testimony of witnesses who attacked Branum's character, including one witness, Perez, who testified that Branum's reputation for truthfulness was poor. Whether Branum's live testimony on direct examination and cross-examination would have been more favorable to the defendant as compared to the preliminary hearing transcript offered at trial is a matter of pure speculation. We will not speculate. We conclude that the continuance granted by the trial court did not substantially prejudice the defendant and therefore deny the defendant relief on this issue.

### III. Admission of Branum's Preliminary Hearing Testimony

■ The defendant next argues that trial court erred in admitting Branum's preliminary hearing testimony into evidence at trial. In raising this issue, the defendant contends that he was unable to adequately cross-examine the witness and that admitting this testimony prejudiced him at trial. We have already addressed the defendant's issues concerning the limited scope of cross-examination and the prejudicial effects of this testimony as related to the speedy trial issue above. However, this court must also determine whether the trial court's admission of this testimony violated the rules against hearsay or the defendant's rights under the Confrontation Clause. We conclude that the trial court properly admitted Branum's preliminary hearing testimony.

The Tennessee Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible unless an exception to the hearsay rule applies. Tenn. R. Evid. 802.

One such exception to the hearsay rules is the "former testimony" exception. According to the Rules of Evidence, the former testimony of a declarant who is unavailable as a witness is admissible. Tenn. R. Evid. 804(b)(1). Unavailability can be satisfied in several ways, including if the declarant is deceased at the time of the hearing. *Id.* 804(a)(4). As relevant to this case, the Rules of Evidence define former testimony as "[t]estimony given as a witness at another hearing of the same or different proceeding ... if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." *Id.* 804(b)(1). A preliminary hearing transcript "is precisely the type of former tes-

timony contemplated under [Rule 804(b)(1) ]." *State v. Michael Dwayne Hatfield,* No. 03C01–9307–CR–00233, 1994 WL 102072, at *3 (Tenn.Crim.App., at Knoxville, Mar. 29, 1994); *see also* Tenn. R. Evid. 804(b)(1), Advisory Comm'n Cmts.

█ Additionally, both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution give the defendant the right to confront all witnesses against him. Regarding the Confrontation Clause, the Tennessee Supreme Court has determined:

> When the prosecution seeks to introduce a declarant's out-of-court statement, and a defendant raises a Confrontation Clause objection, the initial determination under *Crawford* [*v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004) ] is whether the statement is testimonial or nontestimonial. If the statement is testimonial, then the trial court must determine whether the declarant is available or unavailable to testify.... If the declarant is unavailable, the trial court must determine whether the accused had a prior opportunity to cross-examine the declarant about the substance of this statement. *Id.* at 68, 124 S.Ct. at 1354. If the accused had such an opportunity, the statement may be admissible if it is not otherwise excludable hearsay. If the accused did not have this opportunity, then the statement must be excluded.

*State v. Maclin,* 183 S.W.3d 335, 351 (Tenn.2006); *see also State v. Summers,* 159 S.W.3d 586, 597 (Tenn.Crim.App.2004) ("[T]he State must show that the declarant is truly unavailable after good faith efforts to obtain his presence" and that "the evidence carries its own indicia of reliability.").

In this case, the record reflects that the state presented exhibits (in the form of a newspaper article regarding Branum's death, as well as her obituary) to establish that Branum had died, and the defendant did not contest that the witness was dead at the time of trial. Furthermore, as stated above, the defendant cross-examined Branum during the preliminary hearing. As such, Branum's preliminary hearing testimony was admissible under the "former testimony" hearsay exception of Rule 804(b)(1) and, pursuant to the test outlined in *Maclin,* did not violate the defendant's rights under the Confrontation Clause. In light of these conclusions, we deny the defendant relief on this issue.

### IV. Trial Court's Refusal to Admit Branum's Statement to Police

█ At trial, the defendant introduced the testimony of Troopers Ryan and Morlock regarding statements that Branum gave to police. In these statements, Branum recalled the events which transpired the day of the accident. The defendant also sought to impeach Branum's preliminary hearing testimony through the testimony of Deputy Brandon Smith of the Union County Sheriff's Department. During Deputy Smith's testimony, he said that when he attempted to serve a subpoena on Branum in November 2004, she made a statement to him. Deputy Smith wrote a report concerning that statement; the defendant attempted to have Deputy Smith read this report into evidence, but the trial court ruled that this testimony was inadmissible hearsay. The report states:

> Ms. Kimberly Branum stated that she and her boyfriend (unknown name) were in route from Kentucky back to Tennessee and during travel they got into an argument. Ms. Branum stated that she and her boyfriend stopped at a gas station just south of Lincoln Memorial University. Ms. Branum stated that a man

who[m] she called Garfield interv[e]ned in the argument or altercation. Ms. Branum stated that she did not know the man.

Ms. Branum stated that the man (Garfield) gave her a ride and they came south toward Maynardville. Ms. Branum stated that the man (Garfield) took a drink out of a clear bottle or jar or some kind of glass container.

. . . .

Ms. Branum stated that the truck she was riding in was red in color with Garfield at the time of the crash.

Ms. Branum stated that she should still have belongings in the truck [which] she believed [were] a change purse and some jewelry.

Ms. Branum stated that she believed the gas station was a BP or a Shell and she believed it was green in color.

The defendant argues that the trial court should have admitted this testimony as a prior inconsistent statement, and that the trial court's refusal to admit this testimony denied the defendant the opportunity to impeach Branum's testimony. We conclude that the trial court's ruling was error, but such error was harmless beyond a reasonable doubt.

This court has noted that under the Tennessee Rules of Evidence, "[a] witness's prior inconsistent statement may be used to impeach the witness." *State v. Philpott*, 882 S.W.2d 394, 406 (Tenn.Crim. App.1994); *see* Tenn. R. Evid. 613. The Rules also permit impeachment of a hearsay declarant:

When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked and, if attacked, may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time,

inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

Tenn. R. Evid. 806. We have held that a situation in which one party places a statement of an unavailable witness into evidence at trial and then the other party seeks to introduce a prior inconsistent statement by that same unavailable witness "appears to fit squarely within the category of admissible impeachment under Rule 806." *State v. Zirkle*, 910 S.W.2d 874, 891 (Tenn.Crim.App.1995). Furthermore, our review of Deputy Smith's summary of Branum's statement leads us to believe that the probative value of the statement would not have been substantially outweighed by its "danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See* Tenn. R. Evid. 403. Accordingly, we conclude that the trial court's exclusion of Deputy Smith's report detailing Branum's prior inconsistent statement was improper.

*Harmless Error Analysis*

■■■ Our finding that the trial court erred in denying the defendant's opportunity to impeach Branum's credibility through Deputy Smith's testimony does not end our analysis. The United States Supreme Court has "repeatedly recognized" that " 'most constitutional errors can be harmless.' " *Washington v. Recuenco*, 548 U.S. 212, 218, 126 S.Ct. 2546, 2551, 165 L.Ed.2d 466 (2006) (citing *Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct.

1827, 144 L.Ed.2d 35 (1999) and quoting *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). The Tennessee Rules of Appellate Procedure provide for harmless error review. *See* Tenn. R.App. P. 36(b). However, "[a]ll errors are not the same, nor do they have the same effect on the judicial process in general or on a particular trial." *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). Accordingly, our supreme court "has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error." *Id.*

 "Structural constitutional errors are errors that compromise the integrity of the judicial process itself." *Id.* (citing *State v. Garrison*, 40 S.W.3d 426, 433 n. 9 (Tenn.2000)). A structural error "necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder*, 527 U.S. at 9, 119 S.Ct. 1827. Accordingly, "[s]tructural constitutional errors are not amenable to harmless error review, and therefore, they require automatic reversal when they occur." *Id.* Examples of structural constitutional errors identified by the Supreme Court include complete denial of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of public trial, and a defective reasonable doubt jury instruction. *Recuenco*, 548 U.S. at 218 n. 2, 126 S.Ct. 2546.

 "[N]on-structural constitutional errors do not require automatic reversal and are, therefore, subject to a harmless error analysis." *Rodriguez*, 254 S.W.3d at 371 (citing *State v. Allen*, 69 S.W.3d 181, 190 (Tenn.2002)). As opposed to structural errors, which render the defendant's involvement in the judicial process fundamentally unfair, the Supreme Court has

noted that non-structural constitutional errors "involve[ ] 'trial error'—error which occurred during the presentation of the case to the jury and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307–08, 111 S.Ct. 1246. While such "trial errors" may be harmless, "[t]he existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." *Rodriguez*, 254 S.W.3d at 371. In other words, non-structural constitutional errors may only be considered harmless when the state can prove " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Allen*, 69 S.W.3d at 190 (quoting *Neder*, 527 U.S. at 15, 119 S.Ct. 1827).

 Non-constitutional errors can be considered harmless if the defendant can "demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.' " *Rodriguez*, 254 S.W.3d at 372 (citations omitted); *see* Tenn. R.App. P. 36(b). Non-constitutional errors identified by our supreme court include most evidentiary rulings, *see State v. Powers*, 101 S.W.3d 383, 397 (Tenn.2003), and errors regarding consolidation and severance of offenses for trial, *see State v. Dotson*, 254 S.W.3d 378, 388 (Tenn.2008).

The Supreme Court has held that a trial court's "constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to ... harmless-error analysis." *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). As such, the trial court's error in denying the defendant his right to impeach Branum through Deputy

Smith's testimony is a non-structural constitutional error, and to sustain the defendant's conviction, the state must prove beyond a reasonable doubt that the error did not contribute to the defendant's conviction. We conclude that the state has met its burden.

In reviewing this issue pursuant to harmless error analysis, the Supreme Court stated:

Whether such error is harmless in a particular case depends upon a host of factors ... includ[ing] the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.*; *see also State v. Sayles,* 49 S.W.3d 275, 280 (Tenn.2001) (adopting *Van Arsdall* test).

In this case, Branum's testimony was important to the state's case as Branum was the only witness who directly testified that the defendant was driving the truck at the time of the accident. However, while Deputy Smith's testimony was excluded, two other witnesses, Troopers Morlock and Ryan, offered testimony that impeached Branum's preliminary hearing testimony. The substance of the troopers' testimony differed from Branum's preliminary hearing testimony in ways similar to those differences exhibited in Deputy Smith's statement. For instance, Deputy Smith noted that Branum did not identify her boyfriend in her statement, while in her preliminary hearing testimony, Branum identified the man as Mike Atkinson. Smith's statement was not admitted, but Trooper Morlock's testimony was admitted, and in his testimony, he stated that Branum identified her boyfriend as Terry Roark. In Deputy Smith's statement, Branum said that the defendant drank some beverage from a clear jar, not beer, as she stated in her preliminary hearing testimony. Again, while this conflicting testimony was not admitted, Troopers Morlock and Ryan testified that Branum did not mention the defendant's drinking alcohol during the evening; according to Trooper Ryan, Branum went so far as to say that the defendant did not appear to be intoxicated.

Additionally, Deputy Smith's written report was similar to Branum's preliminary hearing testimony and the impeaching testimony of Troopers Ryan and Morlock in several respects. Branum, Deputy Smith, and the two troopers all indicated that, according to Branum, she traveled into Tennessee with another person. Deputy Smith and Trooper Ryan testified that, according to Branum, she and the other person stopped at a gas station to buy beer, which was consistent with Branum's preliminary hearing testimony. According to Trooper Morlock, Branum did not indicate to him the specific type of store at which the travelers bought beer. The troopers and the deputy all testified that Branum said that she got into the defendant's truck at the store, at which point the defendant drove off, all of which was consistent with Branum's preliminary hearing testimony. Branum testified that she and her male companion got into a fight which the defendant broke up; Trooper Ryan and Deputy Smith each indicated that Branum relayed this story about the defendant breaking up a fight.

The record reveals that the defendant had ample opportunity to impeach Branum's preliminary hearing testimony, and Deputy Smith's proposed testimony was cumulative in that it shared with the troopers' testimony both similarities with

and differences from Branum's preliminary hearing testimony. Thus, the trial court's exclusion of Deputy Smith's proposed testimony did not contribute to the defendant's guilty verdict. We therefore conclude that the trial court's error in excluding Deputy Smith's testimony was harmless beyond a reasonable doubt, and we deny the defendant relief on this issue.

### V. Jury Instructions

■ The defendant next contends that the trial court erred in its instructions to the jury. The defendant argues that the trial court erred in its instructions regarding theft of property in that the trial court issued jury instructions regarding both the "obtaining" and "exercising control" theories of the offense, while the defendant was only indicted under the "exercising control" theory. The defendant asserts that this instruction was particularly problematic given that the evidence established that the truck was taken from Knox County, and therefore the defendant could not be convicted under the "obtaining" theory of theft in a case tried in Claiborne County. The defendant also argues that because the trial court gave an instruction regarding criminal responsibility, it should have informed the jury that Branum was an accomplice and should have given a corresponding instruction regarding accomplice testimony. We conclude that the defendant has waived these issues regarding the jury instructions and that the issues do not merit relief under plain error review.

### Standard of Review

■ In criminal cases, a defendant has the right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn.2000). The material elements of the charged offense should be described and defined in connection with that offense. *State v. Ducker*, 27 S.W.3d 889, 899 (Tenn.2000); *State v. Cravens*, 764 S.W.2d 754, 756 (Tenn.1989). The failure to do so deprives the defendant of the constitutional right to a jury trial and subjects the erroneous jury instruction to harmless error analysis. *Garrison*, 40 S.W.3d at 433–34. A jury instruction, however, must be reviewed in its entirety and read as a whole rather than in isolation. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn.2004). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn.2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn.1998)).

### Waiver and Plain Error

The defendant did not object to either the inclusion of the "obtaining" element in the theft jury instruction or the omission of an accomplice jury instruction. Regarding the theft jury instruction, the Tennessee Supreme Court, interpreting Rule 30(b) of the Tennessee Rules of Criminal Procedure, has held that a defendant's right to challenge an erroneous jury instruction is not waived by his failure to make an objection at trial. *State v. Lynn*, 924 S.W.2d 892, 898–99 (Tenn.1996). The defendant may still raise the issue in a motion for new trial. *Id.* However, the defendant did not address the theft jury instruction in his motion for new trial. Rather, the defendant attempted to raise this issue for the first time on appeal in the context of sufficiency of the evidence, an issue which is not waived by the defendant's failure to raise it in his motion for new trial. *See State v. Boxley*, 76 S.W.3d 381, 390 (Tenn.Crim.App.2001); Tenn. R.App. P. 3(e). In our view, the defendant's issue concerning the theft jury instruction cannot be considered a sufficien-

cy of evidence issue, and therefore the defendant has waived the issue for failing to include it in his motion for new trial. *See* Tenn. R.App. P. 3(e).

 Regarding the omitted accomplice testimony instruction, the defendant did raise this issue in his motion for new trial. However, our supreme court has noted that "[i]n contrast to an erroneous instruction or the failure to give a requested instruction," any "alleged omissions in the jury charge must be called to the trial judge's attention or be regarded as waived." *State v. Robinson,* 146 S.W.3d 469, 509 (Tenn.2004). Thus, because the defendant did not request an accomplice testimony jury instruction, the issue is waived even though it was raised in the motion for new trial.

 However, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R.Crim. P. 52(b); *see* Tenn. R.App. P. 36(b). In conducting a plain error review, a court will reverse for plain error only if:

(a) the record ... clearly establish[es] what occurred in the trial court;

(b) a clear and unequivocal rule of law [has] been breached;

(c) a substantial right of the accused [has] been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith,* 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson,* 899 S.W.2d 626, 641–42 (Tenn.Crim.App.1994)). The appellate court need not consider all five factors if any single factor indicates that relief is not warranted. *Smith,* 24

S.W.3d at 283. Furthermore, for this court to reverse the judgment of a trial court, the " 'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Adkisson,* 899 S.W.2d at 642.

 Regarding the theft instruction, the record clearly establishes that the trial court instructed the jury that the defendant could be convicted if the jury found beyond a reasonable doubt that "the defendant knowingly obtained or exercised control over property owned by Bill Evans," while the defendant was indicted under the "exercising control" theory only. This court has instructed that "when a statute contains different ways to commit the offense it proscribes, the instruction given to the jury should be limited to the precise offense alleged in the charging instrument to the exclusion of the remaining theories." *State v. Wayne E. Mitchell,* No. 01C01–9209–CR–00295, 1993 WL 65844, at *3 (Tenn.Crim.App., at Nashville, Mar. 11, 1993). However, any error the trial court committed in instructing the jury on the theft offense did not adversely affect the defendant's substantial rights, nor is consideration of the error necessary to achieve substantial justice. While the jury was instructed on both the "taking" and "exercising control theories", none of the evidence produced at trial went toward establishing the defendant's guilt under the "taking" theory. The evidence, which clearly established that the truck was taken in Knox County, would not have been sufficient for a jury to convict the defendant of committing the offense in Claiborne County under the "taking" theory. The evidence produced at trial ultimately addressed only one theory: the "exercising control" theory under which the defendant

was indicted. Our conclusion here is similar to a previous holding in which we affirmed a defendant's aggravated rape conviction where the defendant was indicted under the "use of a deadly weapon" theory, the other two theories were presented to the jury, and the evidence produced at trial only supported the defendant's guilt according to the theory under which he was indicted. *See State v. Larry Brown,* C.C.A. No. 89–53–III, 1989 WL 98080, at **4–5 (Tenn.Crim.App., at Nashville, Aug. 25, 1989). We therefore conclude, as we did in *Larry Brown,* that the trial court's instruction regarding the "taking" theory, which was not charged in the indictment, "was surplusage and did not affect the outcome of the trial." *Id.* at *5.

 Regarding the trial court's criminal responsibility jury instruction, the record establishes what occurred at the trial court level. However, the other plain error review standards are not met. Regarding whether a clear and unequivocal rule of law has been breached, our supreme court has explained the role of an accomplice as follows:

> "An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Allen,* 976 S.W.2d 661, 666 (Tenn.Crim.App. 1997). The test generally applied in determining whether a witness is an accomplice is whether the alleged accomplice could be indicted for the same offense charged against the defendant. *See id.* In this state, if the offense in question was not committed by the person's own conduct, the person may, nonetheless, be criminally responsible as a principal to the offense if the person solicits, directs, aids, or attempts to aid another person to commit the offense. See Tenn.Code Ann. § 39–11–402(2)

*State v. Thomas,* 158 S.W.3d 361, 401–02 (Tenn.2005) (appendix).

In this case, the defendant testified that his last recollection prior to finding himself in a hospital was that Branum was driving the Dodge truck. Under a criminal responsibility theory, in which Branum was driving at the time of the accident, Branum would be the principal actor, not an accomplice. Rather, the defendant would be the accomplice. The instruction by the trial court that the defendant may be criminally responsible for the actions of a principal does not, therefore, implicate the accomplice jury instruction, which in this case would be predicated upon a finding that Branum was the accomplice, rather than the principal. Accordingly, we cannot conclude that a clear and unequivocal rule of law was breached in this instance.

Next, we will examine the defendant's contention that an accomplice jury instruction should have been given as it relates to the jury's consideration of Branum's preliminary hearing testimony. In this case, the only way Branum could have been considered an accomplice was if the defendant was driving the truck (with Branum as his passenger) at the time of the accident. Thus, had the accomplice instruction been given, the jury would have been instructed that a finding of guilt must be supported by evidence that corroborated Branum's testimony. *See generally State v. Bane,* 57 S.W.3d 411, 419 (Tenn.2001) (Tennessee Supreme Court "has repeatedly held that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense."). We conclude that there was ample evidence introduced at trial to corroborate Branum's testimony that the defendant was driving at the time of the accident. The truck's driver's side had extensive damage, while the passenger side had less damage, and the defendant's injuries were far more

severe than were Branum's. The evidence also showed that the defendant was found outside the truck, while Branum was found in the passenger seat. Accordingly, substantial justice does not require that this court grant relief based on the trial court's failure to instruct the jury on accomplice testimony.

In light of the above analysis, we conclude that the trial court did not commit plain error as to either of the two challenged jury instructions. The defendant is denied relief on this issue.

### VI. Sufficiency of Evidence

The defendant next argues that the evidence produced at trial was insufficient to support any of his felony convictions. We disagree.

#### Standard of Review

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. *See State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn.1984); *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. *See State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. *Id.*; *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass,* 13 S.W.3d 389, 392–93 (Tenn.Crim. App.1999).

#### Stipulations and Alternate Theories

As a preliminary matter, we note that in this case, the parties stipulated that the accident was the proximate cause of the serious bodily injury and death suffered by the victims, the record indicates that the defendant had a 1996 driving under the influence (DUI) conviction, and the defendant's blood sample taken at the accident scene was tested by the TBI, a test that revealed his blood alcohol content to be 0.30%. As to the remaining elements of the offenses, the trial court, pursuant to the state's request, instructed the jury on criminal responsibility on counts three and four of the indictment, which charged the defendant with vehicular assault and vehicular homicide. However, while the jury deliberated these two charges under the theory of criminal responsibility, we conclude that the jury ultimately found beyond a reasonable doubt that the defendant was driving the Dodge truck at the time of the accident.

Our conclusion is based on the jury's verdict in count 2 of the indictment, in which the jury convicted the defendant of driving on a revoked license. As instructed, the jury could have only found the defendant guilty of this offense had it found beyond a reasonable doubt that the defendant operated a motor vehicle in Claiborne County while his license was revoked. *See* Tenn.Code Ann. § 55–50–504(a)(1) (2008). The defendant admitted

to driving the Dodge truck in Campbell County on the day of the accident before the accident occurred, but these facts were ultimately not at issue in this case. In a jury-out discussion held before it instructed the jury, the trial court informed the parties as follows:

> [THE COURT]: The only reason this defendant ... might be convicted of DUI is for the operation or allowing the operation of the vehicle ... *at the time that the death and this incident occurred.* This defendant is not subject to jeopardy for driving at a different time in this county.... [T]he [j]ury has to deal with one criminal episode in determining the defendant's guilt on any charge here.
>
> So, General, the State of Tennessee is required to elect ... certain acts that you want the defendant to be exposed to guilt on.
>
> [A.D.A. EFFLER]: Your Honor, we have no problem with that, with those being the acts dealing with ... the wreck itself.

(Emphasis added). In light of this exchange, during its closing argument the Assistant District Attorney said the following:

> Now, let me narrow the field for you a little bit. We know that [the defendant has] admitted to driving the vehicle on other occasions, and he's admitted to driving the vehicle earlier that day. We're not trying to convince you that he should be found guilty of driving on a revoked, suspended or cancelled license because he was driving at 10:00 o'clock that morning or [at] noon. We're talking about a specific time period down on Highway 33 in the southern part of [Claiborne] [C]ounty on the evening of October 16th when this collision occurred. That's when we say he was

driving on a suspended, cancelled or revoked license.

Accordingly, while the jury was instructed on the theory of criminal responsibility as to the vehicular homicide and vehicular assault, the jury, through its guilty verdict on the driving on a revoked license charge, adopted the theory that the defendant was in fact driving the Dodge truck at the time of the accident. As such, we need not address the criminal responsibility theory in the remainder of our analysis on the defendant's sufficiency of evidence issue.

### *Vehicular Assault and Aggravated Vehicular Homicide*

■ The defendant was convicted of vehicular assault and aggravated vehicular homicide. According to our criminal code, "[a] person commits vehicular assault who, as the proximate result of the person's intoxication as set forth in § 55–10–401, recklessly causes serious bodily injury to another person by the operation of a motor vehicle." Tenn.Code Ann. § 39–13–106 (2003); *see also* Tenn.Code Ann. § 55–10–401(a)(2) (2003) (providing that it is unlawful for one to drive or be in physical control of a vehicle while the person's blood alcohol content is .08% or greater); *id.* § 55–10–408 (evidence that a person's blood alcohol content is .08% or greater creates presumption that defendant's ability to drive is impaired). As relevant to this case, vehicular homicide is defined as "the reckless killing of another by the operation of an automobile ... as the proximate result of ... [t]he driver's intoxication." Tenn.Code Ann. § 39–13–213(a)(2) (2003). Aggravated vehicular homicide, as relevant to this case, is vehicular homicide where the defendant's blood alcohol content was at least 0.20% at the time of the offense and the defendant had at least one prior conviction for vehicular assault or driving under the influence. *Id.*

§ 39–13–218(a)(3)(A) (2003). As stated above, the parties stipulated to most of the elements of the offenses; hence, the only issue here is whether the evidence was sufficient to establish beyond a reasonable doubt that the defendant was driving at the time of the accident.

The defendant asserts that the evidence was insufficient to establish that he was driving at the time of the accident because Branum was the only person who so testified. However, the jury heard the testimony of several witnesses, including the defendant, who claimed that they saw Branum driving the truck the day of the accident, and testimony, in the form of character evidence and prior inconsistent statements, designed to impeach Branum's credibility. After hearing this testimony, the jury still chose to accredit Branum's testimony, as was within its province as trier of fact. Furthermore, the evidence produced at trial showed that the truck's driver's side had extensive damage, while the passenger side had less damage, and the defendant's injuries were far more severe than were Branum's. The evidence also showed that the defendant was found outside the truck, while Branum was found in the passenger seat. Based on this evidence, we conclude that the jury could have found beyond a reasonable doubt that the defendant was driving the truck at the time of the accident, thus supporting convictions for aggravated vehicular homicide and vehicular assault.

### Theft of Property

■ As charged in the indictment, our criminal code establishes that "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly . . . exercises control over the property without the owner's effective consent." Tenn.Code Ann. § 39–14–103 (2003). In this case, Bill Evans testified that his red Dodge pickup truck, valued between $6000 and $9000, was taken from him in October 2004, and that the police later notified him that his truck was involved in the accident at issue in this case. The defendant admitted to taking the truck and driving it over the next several weeks, including the day of the accident. The defendant testified that he intended to return the pickup truck to Evans, but he never did so. However, he also admitted to driving the truck on "back roads" of Claiborne County so as to avoid being seen by Evans or Bridges. The defendant argues that because he did not intend to permanently deprive Evans of his truck, his conviction for theft cannot be sustained. However, the jury chose to discredit this theory, as was its prerogative. As stated above, the jury also found that the defendant was driving the truck in Claiborne County at the time of the accident. As such, we conclude that the evidence produced at trial was sufficient to sustain the defendant's conviction for theft of property valued between $1000 and $10,000 based on the "exercise of control" theory. The defendant is denied relief on this issue.

### VII. Jury Unanimity

■ The defendant also argues that "the jury's general verdict denied the defendant his constitutional right to a unanimous verdict." We disagree.

■ The defendant's constitutional right to a jury trial "necessarily includes the right to a unanimous jury verdict before a conviction of a criminal offense may be imposed." *State v. Lemacks*, 996 S.W.2d 166, 169–70 (Tenn.1999) (citations omitted). "[Q]uestions of jury unanimity may arise in cases where an accused is indicted and prosecuted for a single offense, but the jury is permitted to consider multiple criminal acts of the type which, if

found beyond a reasonable doubt, would each support a conviction for the charged offense." *Id.* at 170 (citing *State v. Brown,* 823 S.W.2d 576, 581–82 (Tenn.Crim.App. 1991)). "To avoid a 'patchwork' verdict of guilt in those cases, the trial judge must 'augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts.'" *Lemacks,* 996 S.W.2d at 170 (quoting *Brown,* 823 S.W.2d at 583).

The defendant's arguments concerning jury unanimity are related to his concerns regarding the state's arguing the criminal responsibility theory to the jury. The defendant argues that the jurors could have differed over whether that the defendant or Branum was driving the car at the time of the accident, thus rendering its guilty verdicts non-unanimous. However, as stated above, in finding the defendant guilty of driving on a revoked license, the jury unanimously and beyond a reasonable doubt found that the defendant, not Branum, was driving the Dodge truck at the time of the accident. This conclusion renders the defendant's argument regarding jury unanimity unpersuasive. We also note our supreme court has repeatedly held that in cases involving a single offense but alternate theories for the defendant's committing the offense, jury unanimity problems are not implicated. *See, e.g., State v. Keen,* 31 S.W.3d 196, 208 (Tenn. 2000); *Lemacks,* 996 S.W.2d at 170–71; *State v. Cribbs,* 967 S.W.2d 773, 787 (Tenn. 1998). Furthermore, the trial court, during jury instructions, gave a special instruction regarding unanimity as required by *Lemacks.* The jury is presumed to have followed jury instructions absent evidence to the contrary. *See State v. Gilliland,* 22 S.W.3d 266, 273 (Tenn.2000); *State v. Johnson,* 762 S.W.2d 110, 116 (Tenn.1988). As such, we conclude that the defendant was not denied his constitu-

tionally protected right to a unanimous verdict.

## VIII. Sentencing

The defendant's final issue is that the trial court improperly sentenced him. The nature of the defendant's claim is twofold. First, the defendant asserts that the trial court imposed an excessive sentence for the defendant's aggravated vehicular homicide conviction. Second, the defendant argues that the trial court improperly imposed consecutive sentences in this case.

■■ An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn.Code Ann. § 40–35–401(d) (2006). As the Sentencing Commission Comments to this section note, on appeal the burden is on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. *State v. Fletcher,* 805 S.W.2d 785, 789 (Tenn.Crim.App.1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each

enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *State v. Jones,* 883 S.W.2d 597, 599 (Tenn. 1994) (citation omitted); *see* Tenn.Code Ann. § 40–35–210(e) (2006).

### Length of Sentence

At the defendant's sentencing hearing, the defendant elected to be sentenced on his felony convictions under the revised sentencing act as enacted by the Tennessee General Assembly in 2005, thus waiving any ex post facto challenges he might have otherwise had. Tennessee's revised sentencing act provides:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40–35–113 and 40–35–114.

Tenn.Code Ann. § 40–35–210(c)(1)–(2) (2006).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. *Id.* § (d)-(f); *State v. Carter,* 254 S.W.3d 335, 342–43 (Tenn.2008). "An appellate court is therefore bound by a trial court's decision as to the length of the sentence as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in … the Sentencing Act." *Carter,* 254 S.W.3d at 346. Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. *See id.*

In imposing a sentence, the trial court may only consider enhancement factors that are "appropriate for the offense" and "not already … essential element[s] of the offense." Tenn.Code Ann. § 40–35–114 (2006). These limitations exclude enhancement factors "based on facts which are used to prove the offense" or "[f]acts which establish the elements of the offense charged." *State v. Jones,* 883 S.W.2d 597, 601 (Tenn.1994). Our supreme court has stated that "[t]he purpose of the limitations is to avoid enhancing the length of sentences based on factors the legislature took into consideration when establishing the range of punishment for the offense." *State v. Poole,* 945 S.W.2d 93, 98 (Tenn. 1997); *Jones,* 883 S.W.2d at 601.

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn.Code Ann.

§§ 40–35–102, –103, –210 (2006); *see also Ashby,* 823 S.W.2d at 168; *State v. Moss,* 727 S.W.2d 229, 236–37.

In this case, the trial court initially applied three enhancement factors to the defendant's sentences: his previous history of criminal convictions in addition to those necessary to establish the appropriate range, the fact that these offenses involved more than one victim, and his failure to comply with release conditions in the past. *See* Tenn.Code Ann. § 40–35–114(1), (3), (8). The defendant proposed three mitigating factors: "[t]he defendant played a minor role in the commission of the offense," "[t]he defendant acted under duress or under the domination of another person, even though the duress or the domination of another person is not sufficient to constitute a defense to the crime," and "[a]ny other factor consistent with the purposes of this chapter," based on the defendant's work ethic. *See id.* § 40–35–113(4), (12)-(13). However, the trial court found that the evidence did not support the application of the proposed mitigating factors to the defendant's case. The trial court initially ordered that the defendant be sentenced to twenty-three years for his aggravated vehicular homicide conviction, three years for his theft conviction, and four years for his vehicular assault conviction. However, at a subsequent hearing, the trial court found that the "multiple victims" enhancement factor did not apply. Consequently, it reduced the defendant's aggravated vehicular homicide sentence to twenty-one years and his vehicular assault conviction to three years. The defendant argues that these sentences were excessive. We disagree.

Initially, we note that the defendant's twenty-one year sentence for aggravated vehicular homicide and three-year sentences for theft and vehicular assault were within the ranges he could have received

for committing his offenses as a Range I, standard offender. *See id.* § 40–35–112(a)(1), (4) (Range I sentence for Class A felony is fifteen to twenty-five years; for Class D felony, two to four years). Regarding the trial court's application of the "previous criminal convictions" enhancement factor, the presentence report and certified copies of convictions included in the record detail that the defendant has a record of over twenty convictions for offenses such as DUI, driving on a revoked license, domestic violence, misdemeanor possession of marijuana, disorderly conduct, evading arrest, and passing worthless checks. The defendant argues that despite this record, the trial court improperly applied the enhancement factor because all of the defendant's prior convictions were misdemeanor convictions and because at least half of the offenses occurred more than ten years before the defendant was sentenced in this case. However, we find these arguments unpersuasive. Our court has noted that "nothing in the [sentencing] statute imposes a time constraint on the trial court's consideration of a defendant's criminal record which spans over a number of years." *State v. Koffman,* 207 S.W.3d 309, 324 (Tenn.Crim.App.2006) (citations omitted). Similarly, the statute does not mandate that only prior felony convictions may be used to establish the defendant's prior criminal history for sentencing purposes. Consequently, the trial court's application of this enhancement factor was supported by the record and did not constitute an abuse of discretion.

Regarding the enhancement factor whereby the defendant failed to comply with release conditions in the past, two of the defendant's former probation officers testified at the sentencing hearing. Jimmy McElhaney testified that he was the defendant's probation officer in 1997, after the defendant was convicted of DUI, two

counts of driving on a revoked license, simple possession, and evading arrest. According to McElhaney, the defendant violated his probation by failing to report to his probation officer, failing to pay court costs and fines, failing to attend DUI school, and failing to undergo a drug and alcohol assessment. Patricia Shriver testified that she was the defendant's probation officer in 1996 after he pled guilty to driving on a revoked license, simple possession, and evading arrest. Shriver testified that the defendant violated his probation by failing to report to his probation officer. According to the certified copies of the defendant's probation violation warrants, the defendant was found in violation of his probation for the offenses outlined by Shriver in February 2000 and for the offenses outlined by McElhaney in April 2000. The defendant argues that this enhancement factor was inapplicable based on the fact that the defendant only had two probation violations against him, both of which were entered six years before sentencing in this case, but we find these arguments unpersuasive. The trial court properly found that application of this enhancement factor was supported by a preponderance of evidence, and we therefore conclude that the trial court's application of this enhancement factor did not constitute an abuse of discretion.

Regarding the three proposed mitigating factors, the trial court specifically noted that it considered the mitigating factors but found that they were not supported by the evidence. Such was within the trial court's discretion. On appeal, the defendant bases two of the mitigating factors on his assertion that Branum, not the defendant, was driving the truck. The jury considered and rejected this argument in convicting the defendant, and we conclude that this argument does not mitigate the defendant's culpability or justify his conduct. Thus, we conclude that the trial

court did not err in finding that the defendant's proposed mitigating factors were unsupported by the evidence.

In conclusion, the trial court properly applied both enhancement factors to the defendant's sentence and properly refused to apply mitigating factors to the sentence. The fact that the trial court reconsidered its initial sentence, found that one of its initially-applied enhancement factors did not apply, and adjusted the defendant's sentence accordingly is further proof that the trial court properly considered the principles of sentencing in reaching its decision. The trial court's imposed sentences are also fully supported by the record. Thus, the defendant is not entitled to relief on this issue.

### Consecutive Sentencing

█ In this case, the trial court ordered the defendant's three-year sentences for theft and vehicular assault to be served concurrently to each other but consecutively to the defendant's twenty-one-year sentence for aggravated vehicular homicide, resulting in an effective twenty-four-year sentence. The defendant argues that imposition of consecutive sentences was improper. We disagree.

Consecutive sentencing is guided by Tennessee Code Annotated section 40–35–115(b), which states in pertinent part that the trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that "[t]he defendant is an offender whose record of criminal activity is extensive." Tenn.Code Ann. § 40–35–115(b)(2) (2006). The trial court is required to "specifically recite the reasons" behind imposition of a consecutive sentence. *See* Tenn. R.Crim. P. 32(c)(1); *see, e.g., State v. Palmer,* 10 S.W.3d 638, 647–48 (Tenn.Crim.App.1999) (noting the requirements of Rule 32(c)(1) for purposes of consecutive sentencing). As stated

above, the record details that the defendant has a lengthy record of criminal convictions, and in imposing consecutive sentences, the trial court stated on the record that "the [defendant] has a record of criminal activity which is extensive.... [T]here's enough evidence of conviction[s] to show the defendant has engaged in criminal activity for the major part of his adult life." Thus, the trial court's imposition of consecutive sentences in this case was proper.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.