IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 12, 2015

**STATE OF TENNESSEE v. NICHOLAS RICO DURANT**

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 41200556     Michael R. Jones, Judge[1]**

**No. M2015-00564-CCA-R3-CD – Filed January 18, 2017**

A jury in the Montgomery County Circuit Court found the Appellant, Nicholas Rico Durant, guilty of the first degree premeditated murder of his wife, and the trial court sentenced him to life imprisonment. On appeal, the Appellant contends that the evidence was not sufficient to establish beyond a reasonable doubt that he acted with premeditation and that the trial court's jury instruction regarding premeditation was not sufficient to "satisfy state and federal constitutional rights to due process and trial by jury." Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Roger E. Nell and Crystal Myers, Clarksville, Tennessee, for the Appellant, Nicholas Rico Durant.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Helen Young, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

---

[1] Judge Michael R. Jones presided over the case at trial. Judge William R. Goodman ruled upon the motion for new trial.

The Appellant's conviction stemmed from the death of his twenty-three-year-old wife, Shardae Wright. The shooting occurred in The Groves apartment complex in Clarksville in the early morning hours of March 3, 2012, approximately one week after their marriage. The Appellant admitted that he shot the victim but contended that he shot her "while in a state of rage" during an argument.

Staff Sergeant Shavonde Chase testified that in January 2012, she was stationed at Fort Campbell. On March 1, she moved into an apartment in The Groves with two other women, one of whom was the victim. Sergeant Chase did not know either woman before she moved into the apartment.

On the evening of March 2, Sergeant Chase, who was asleep in her room, was awakened when she heard arguing. She left her bedroom, reminded her roommates that she was there, went to the kitchen, then returned to her bedroom. She did not notice anything amiss. She fell asleep again and was awakened by the victim's knocking on her door. The victim ran into the bedroom, followed seconds later by the Appellant, who had a gun. Sergeant Chase said that the victim and the Appellant might have said things "back and forth," but the only thing she could recall specifically was the victim's saying, "Please don't, I have kids." The two women ran into the bathroom. Sergeant Chase told the Appellant to calm down and asked "what was happening." The Appellant came into the bathroom and pointed a gun at the victim. Sergeant Chase ran around the Appellant and out of the apartment. As she was leaving, she heard gunshots.

Sergeant Chase said that on the evening of the shooting, she was wearing pajama pants and a blue, long-sleeved top. Her hair was either in a bun or a ponytail. After she left the apartment, she ran to the housing office to try to find a telephone to call for help. Unable to find a telephone, she went to Building 10, stopped a woman in a car, and used her telephone to call 911.

Sergeant Chase did not recall if she or the victim shut the door when they went into the bathroom and did not recall if the Appellant did anything to the door. She recalled, though, that the bathroom door was not damaged before that night. Sergeant Chase said that she was a heavy sleeper and would not be surprised if she had slept through some gunshots.

Sergeant Chase said that four days after the shooting, she spent three weeks in Skyline, a mental health facility, recovering from "issues" stemming from the shooting. She acknowledged that the offense still affected her. She also acknowledged that her memory of the day of the shooting was "bad" and that she did not remember many details, just "the climax of it all." Sergeant Chase said that she had never met the Appellant before that night.

Sergeant England Thomas Phillips testified that he met the Appellant and the victim while they were stationed at Fort Campbell. He thought the Appellant began dating the victim late in 2011 and knew the Appellant had a child with another woman, Dedra Allen. Sergeant Phillips had heard that the Appellant and the victim often fought and then reconciled, but he never witnessed any problems between them. The Appellant never told Sergeant Phillips about any problems between Allen and the victim. Sergeant Phillips said the Appellant was "quiet" about getting married, seemed happy that he had a child, and wanted to be a good father.

Sergeant Phillips said that one or two days before the victim was killed, the Appellant and the victim came to Sergeant Phillips's house around 8:00 p.m. Sergeant Phillips estimated that The Groves apartment complex was approximately ten minutes from his house. While Sergeant Phillips cut the Appellant's hair, the victim sat on the couch next to Sergeant Phillips's wife, who was holding the Appellant's baby. Neither the Appellant nor the victim appeared to have been drinking. Sergeant Phillips saw a cut, which appeared to be healing, on the Appellant's arm. The Appellant said that the victim had cut him about a week before, and he did not seem to be bothered by the cut. The Appellant left when the haircut was finished. Sergeant Phillips said that he and the Appellant had planned to attend a ball game honoring soldiers the next day.

Sergeant Phillips said that around 5:00 p.m. the next day, Detective Mike Ulrey came to Sergeant Phillips's house and asked if Sergeant Phillips knew where the Appellant was. While the police were there, the Appellant called, and Sergeant Phillips let Detective Ulrey speak with the Appellant. Regarding the shooting, Sergeant Phillips said, "I never seen (sic) it coming."

On cross-examination, Sergeant Phillips stated that the Appellant was generally a calm person and that he had never seen the Appellant lose his temper. He described the Appellant as an "outstanding soldier" who was honest and athletic and had never given Sergeant Phillips problems.

On redirect examination, Sergeant Phillips said that the Appellant was "very together," "[i]n control of himself," and did not have difficulties at work. Sergeant Phillips never saw the Appellant act afraid of anyone, including the victim, and opined that the Appellant, who had been through combat training, had no reason to fear anyone. Sergeant Phillips said that the Appellant married the victim ten or eleven days before the shooting. Although the Appellant did not talk about his concerns, Sergeant Phillips surmised from the Appellant's facial expressions that the Appellant had "doubts" about his marriage and that the Appellant thought "he may have moved too fast on that one."

Darion Antwaine Pittman testified that he spent a lot of time at Kim Rose's apartment at The Groves. At the time of the shooting, Rose and the victim were sharing

an apartment, but they did not know each other very well.  Pittman explained that residents of The Groves did not have the option of choosing a roommate.  Pittman had never seen the Appellant prior to the night of the shooting and had seen the victim only a couple of times.

Pittman said that he went to the victim's apartment around 7:00 p.m. on March 2.  The victim and Twan McBride walked in with a baby.  The victim and the man left to "drop off" the baby and returned with some alcohol.  Rose had a drink then left the apartment.

Pittman said that around 9:00 p.m., the Appellant came to the apartment.  Pittman, the Appellant, McBride, and the victim talked about whether to go to a club or play cards.  Pittman said everyone had been drinking, but they were not drunk.  The victim did not want to go out, and the Appellant decided to stay at the apartment.  The Appellant explained that he knew the victim would get mad if he went out and that he did not want to fight with her.  Thereafter, while McBride was getting ready to go to the club, the victim and the Appellant went into her bedroom.  Pittman looked inside the victim's bedroom and saw the victim sitting on her bed with a laptop computer in front of her. The Appellant pulled a black box from underneath the bed, opened the box, removed a gun, and showed the gun to Pittman and McBride.  Pittman said the gun had "a honeycomb shaped barrel" and a "long clip."  When Pittman and McBride left the apartment, the Appellant followed them to the parking lot.  Pittman said the Appellant walked as if he had something under his shirt.  Pittman did not hear a disagreement between the victim and the Appellant that night.  Pittman never saw the Appellant in the victim's bed and did not see the victim throw water on the Appellant.

Pittman said that later that night, McBride received a telephone call and learned that the victim had been killed.  McBride and Pittman returned to The Groves but could not get inside the complex because the police were there.

On cross-examination, Pittman said that on the night of the offense, everyone in the apartment was drinking "shots" of vodka and gin.  He could not recall whether the alcohol was mixed with anything.  Pittman estimated that he and McBride left the apartment around 10:30 p.m.  Pittman thought the Appellant had the gun when he followed the men outside but was not certain.  Pittman did not know if the Appellant returned to the apartment.

Brian D. Casto testified that at the time of the offense, he lived with his girlfriend Stephanie Buchanan and Jerry Dolnick at the apartment across from the victim's apartment.  He had seen the victim and the Appellant on one or two occasions.  Shortly before Casto went to bed on the night of the shooting, he walked outside and smoked a cigarette.  He did not notice anything unusual.  He went to bed around 11:20 or 11:30

- 4 -

p.m. and fell asleep twenty to twenty-five minutes later. At midnight, he was awakened by a "series of loud noises" that sounded like gunshots. They occurred two to five minutes apart. Casto also heard a scream.

Casto called the police officer who worked at the apartment complex. When the officer did not answer the call, Casto called 911 then walked to the front door and looked out the peephole. Upon seeing nothing, he opened the door. Five or six steps down the stairs, he saw an open gun case. The lock on the front door of the victim's apartment appeared to have been "tampered with." Nine or ten bullet holes were in the door, and shell casings were on the landing in front of the victim's door.

On cross-examination, Casto said that he did not see anyone outside while he was smoking. He said that the apartment complex was unusually loud on Friday nights and Saturday mornings because of college students "partying."

Stephanie Buchanan testified that in March 2012, she was living in an apartment at The Groves with Casto, Jerry Gammon, and John Wallace. Around 11:45 p.m., she and Wallace were smoking outside in the stairwell leading to the third floor. Buchanan saw a man come up the stairs, pause and turn as if he were drunk or lost, then go down the stairs. A few seconds later, the man started up the stairs and then paused in the middle of the stairway. Buchanan heard "a shuffling and a clicking" and assumed that the man had dropped something. The man asked for directions to apartment 620, and Buchanan informed him that there was no apartment 620, explaining that all of the apartment numbers ended in 1, 2, 3, or 4.

Buchanan testified that she did not get a good look at the man's face because she was paying attention to his behavior. She described him as "an average black guy, regular street clothes, nothing really stood out, . . . short hair, clean-shaven, looked like a normal kid." She said the man was of average height, which she estimated was between five feet and eight inches and five feet and ten inches, weighed an estimated 190 pounds, and had an athletic build. His complexion was "medium," neither dark nor light.

After seeing the man, Buchanan and Wallace returned to the apartment. A couple of minutes later, she heard gunshots.

On cross-examination, Buchanan said that she would not consider someone over six feet tall to be of average height. Buchanan did not really notice the man's clothes but thought the man was wearing "[r]egular street clothes," which may have been jeans and a t-shirt. She did not see a gun case, but she explained that she "didn't go over to look."

Buchanan estimated that it was midnight when she returned to her apartment. She heard the gunshots minutes later. She described the shots as "very rapid fire" and

estimated that a couple of minutes elapsed between the first and last shots. Buchanan said that a lot of military personnel and college students lived in the apartment complex, that parties occurred frequently, and that seeing strangers around the complex was not unusual. Buchanan acknowledged that the police had her look at photographs and that she identified someone other than the Appellant as the man she saw.

Joshua Day testified that on the night of the shooting, he was attending a party in Building 7 of The Groves. Sometime between 11:00 p.m. and 1:00 a.m., he went out on the second floor landing near Building 6. He saw someone at Building 6 then heard "pop, pop, pop." He noticed "some smoke, some flash from what . . . [he] heard." Day said that he did not get a good look at the individual at Building 6 but acknowledged he later told the police that the person's hair was short and was either a new haircut or a receding hairline.

Day called 911 as he walked to the second floor of Building 6, where he had seen the flash. He saw bullet holes in an apartment door, and the door appeared to have been kicked in. He told the 911 operator that he heard seven or eight shots, a pause of thirty to forty-five seconds, a few muffled shots, a few more seconds of quiet, and then more muffled shots.

At some point, the police showed Day a photograph lineup, from which he identified the Appellant. Day said that he did not know the Appellant, the victim, or anyone who lived in Building 6.

On cross-examination, Day said that Building 7 was approximately 200 feet from Building 6. Nonetheless, he was able to identify the Appellant in the photograph lineup. Day estimated that approximately two minutes elapsed from the first shot to the last shot. Day said that he saw the Appellant leave the apartment where the shooting occurred; the Appellant was walking fast but not running.

On redirect examination, Day said that he told the police that he saw the Appellant back away from the door and then heard shots. He also said that he thought the Appellant struggled with the door before going inside the apartment. Day heard more shots thirty to forty-five seconds after the first shots.

Tamara Foster testified that in March 2012, she lived on the first floor of Building 5 of The Groves. From her bedroom window, she could see the side of Building 6. On the night of the shooting, Foster was lying in bed talking on the telephone when she heard loud, banging noises that she thought were gunshots. She got up and looked out the bedroom window. She saw a man kick in or break a door of an apartment in Building 6, and then the man walked into the apartment. Three to five minutes later, she saw a black woman with her hair in a ponytail and wearing a tank top and pajama pants run from the

apartment. About two minutes later, the man walked out of the apartment, down the stairs, and toward Foster's bedroom window. He dropped something in the grass then bent and picked it up.

Foster said that she had never seen the victim or the man before that night. She told the police that the man was wearing red and black basketball shorts. During trial, she identified a photograph of the Appellant's shorts, which were red and blue.

Foster acknowledged that she did not call 911. She explained that she thought nothing serious had happened because she saw the woman run away.

Clarksville Police Officer John Daniel Bushnell testified that on the night of March 3, 2012, he went to the victim's apartment. He said that he found bullet casings in the stairwell leading up to the second floor, more bullet casings on the landing outside of the victim's apartment, and bullet holes in the front door. The front door was open. It appeared that someone had kicked the door open, and the lock was damaged.

Officer Bushnell said that the apartment had a common area, a common kitchen, and three bedrooms that each had a private bathroom. The door to the first bedroom, which Officer Bushnell referred to as room A, was closed. He went inside room A, but it was empty. The apartment's second bedroom, room B, was also empty. The door to room B appeared to have been kicked open. Inside the bathroom of the third bedroom, room C, Officer Bushnell saw multiple bullet holes and several bullet casings on the floor. The victim, who was dead, was curled up in the bathtub. A handgun was "underneath her head as she [was] kind of grasping it with her right arm."

Clarksville Police Detective Demon Chestnut testified that he was the lead investigator in the case. In the victim's apartment, Detective Chestnut saw a partial shoe print on the bathroom door in Sergeant Chase's room and two small cracks near the handle. Detective Chestnut said that the gun found in Sergeant Chase's bathtub was registered to the Appellant. Detective Chestnut did not have the gun, the gun case, the magazine, the bullets, or the cartridges tested for fingerprints.

Clarksville Police Sergeant Terry Minton testified that he was the commander of the crime scene team, which took photographs of the scene and recovered evidence. On the first floor landing of the stairway leading to the victim's apartment, the team found a shell casing. As they progressed up the stairs, they found a black pen, a tube of Chapstick, a Sharpie marker, and an open, black, Intratec brand gun case. Further up the stairs, they found a spent shell casing.

On the second floor landing in front of the victim's apartment, the team found an unfired nine millimeter Luger bullet and eight spent shell casings. Ten bullet holes were

in the front door of the victim's apartment, and the door frame was damaged. The front door opened to a hallway that led into the kitchen. In the kitchen, the team found multiple bullet fragments on the floor and evidence of two bullet strikes on the refrigerator. Another bullet casing was found on the floor around the dining table in the common area. A military uniform was on the table. An open box of Winchester nine millimeter bullets was on top of the uniform, and a military cap and a military wallet containing the Appellant's identification cards were underneath the uniform. The door to the victim's bedroom was heavily damaged near the knob. On the bed, the team found a man's black ring.

Sergeant Minton said that the doorframe leading to the small bathroom in Sergeant Chase's room was damaged. They found the victim's body in the bathtub. Her legs were curled underneath her, and she was lying face down with her head turned toward the room. An Intratec nine millimeter Luger handgun was placed partially beneath the victim with her hand on the gun. An empty gun magazine was found between the victim's chest and arm, and two spent shell casings were found in the tub. A set of keys to the Appellant's vehicle was found inside the victim's left boot. The team also found four spent shell casings and an unfired bullet inside the bathroom.

Clarksville Police Detective Michael Ulrey testified that at 8:00 or 9:00 a.m. on March 3, he went to Sergeant Phillips's residence to ask if Sergeant Phillips knew where the Appellant was. The Appellant called Sergeant Phillips while the detective was there. Detective Ulrey took the telephone, told the Appellant that the police needed to talk with him, and asked if he knew what the police wanted to discuss. The Appellant responded, "[Y]eah, 'cuz I killed my wife because she tried to kill me."

North Carolina Highway Patrol Trooper Michael Tedder testified that on March 3, the Appellant was stopped in the southbound lane of Interstate 26 in North Carolina. Trooper Tedder estimated that the location of the stop was a nine-and-one-half-hour drive from Clarksville. The Appellant was driving a white Dodge Charger, and he was wearing red basketball shorts and a blue shirt. Trooper Tedder noticed small red dots on the shorts, which he suspected were blood drops. Trooper Tedder checked the Appellant's hands for any injuries and found none.

On cross-examination, Trooper Tedder said that the Appellant was not armed and did not resist the troopers during the stop.

Clarksville Police Officer Scott Beaubien, a member of the crime scene team, testified that he processed the victim's white Dodge Charger while it was in the garage of the North Carolina Highway Patrol. In a cup holder in the center console, Officer Beaubien found a cellular telephone. Underneath the telephone, he found a woman's engagement ring and a wedding ring that were stained with blood. The keys to the car

were in the ignition and were stained with a significant amount of blood. The victim's military dog tags and identification as well as her credit and debit cards also were found in the car. The Appellant and the victim's marriage certificate was in the back seat.

James Russell Davis, II, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI) crime laboratory, testified that he found gunshot primer residue on the red long-sleeved shirt, the dark short-sleeved shirt, and the shorts the Appellant was wearing on the night of the shooting.

TBI special agent forensic scientist Kevin Warner testified that the Clarksville Police Department submitted seventeen spent cartridge casings for testing. The police also provided the Appellant's nine millimeter automatic pistol and empty magazine that were found with the victim's body. He noted that the gun functioned normally and that the magazine held thirty-three bullets. Testing revealed that all the cartridge casings had been fired from that gun.

Agent Warner said that he examined the front door of the victim's apartment. He determined that eleven shots were fired at the door and that ten bullets penetrated the door.

TBI special agent forensic scientist Chad Johnson testified that the victim's blood was found on the wedding rings, keys, and key ring that were in the Dodge Charger.

Dr. Thomas Deering, a forensic pathologist who performed the victim's autopsy, testified that the cause of the victim's death was multiple gunshot wounds. No bullets were recovered from the victim's body. The victim was shot in the right side of her chest, the center of her back, the left side of her head just below and behind her ear, her shoulder, her right cheek, and her wrist. Dr. Deering found no evidence of soot or stippling on the skin around the wounds, which indicated either the shots were fired from a distance of over two feet or were shot through something such as a pillow or clothing. The position of the victim's body and the path of the wounds were consistent with the victim's kneeling or lying in the bathtub. Dr. Deering noted that the victim had superficial blunt trauma injuries on her arms that could have been defensive wounds. Wounds on her hands and wrists could have been caused by "put[ting her] hands in the way."

The twenty-two-year-old Appellant testified that he was an Army mechanic, that he was stationed at Fort Campbell in February 2011, and that he met Dedra Allen at the end of March 2011. She became pregnant in June 2011, and they learned of the pregnancy in July 2011. That same month, Allen ended their romantic relationship after discovering the Appellant's affairs with other women, including the victim. Nevertheless, Allen told him she wanted him to "be there" for their baby.

The Appellant said he met the victim at work in June 2011, and they started dating around the end of July. The victim told him that she had been in abusive relationships in the past. After he discovered that Allen was pregnant, he told the victim that if she wanted to be with him, she had to accept his child.

The Appellant said that as his relationship with the victim progressed and as the baby's due date grew closer, the victim became jealous and wanted more attention. They argued because her friends told her she should not be with him.

The Appellant said that the victim had hit him several times, usually in the face with her fists, and that she had thrown things. She first struck him near the end of 2011, and, as their relationship continued, the hitting incidents became more frequent. He acknowledged that he could have reported the abuse to the police but said that he did not want to get her in trouble. The Appellant conceded that he had been trained in a military "combatives class" and that he had stopped the victim from hitting him "plenty of times." He explained that sometimes he held her down and then she cried, apologized, and promised not to hit him again. The Appellant maintained that he did not feel comfortable hitting her, explaining, "I never hit a female in my life."

The Appellant said he did not feel threatened when the victim hit him, but he was irritated. Around the beginning of 2012, the victim cut him with a small kitchen knife, but he did not need to go to the hospital. Around the same time, the couple's arguing became more frequent. The Appellant talked with Sergeant Phillips and McBride about the arguing. The Appellant said that he loved the victim and that leaving her was difficult. Whenever he tried to leave, the victim cried and told him he could not leave. The Appellant felt "bad" when she cried, so he stayed with her.

The Appellant said that he and the victim broke up at the beginning of 2012 because the victim thought he did not give her enough attention; however, they soon reconciled. He said that each time they reconciled, the victim threatened to kill him if he left her again. He said that he did not take her seriously until she cut him and vowed "on her son's life" to kill him if he left her.

The Appellant said that while Allen was pregnant, he took her to doctors' appointments and ensured she had everything she needed. He was present for the birth of their daughter on Tuesday, February 21, 2012. The Appellant stayed at the hospital on Tuesday and Wednesday night but went home on Thursday night because the victim was "complaining about her time." On Friday, the Appellant drove Allen and the baby home from the hospital.

The Appellant said that the victim's demeanor changed after his daughter was born and that she always seemed to be in a bad mood. Regardless, the Appellant and the victim became engaged on Valentine's Day 2012 and were married ten days later. After their marriage, the victim became even more jealous because she felt she "owned" the Appellant.

The Appellant said that he and the victim had a few arguments during the week they were married. He had doubts about the marriage and thought he "moved too fast." On March 1, he asked the victim for an annulment, but he then decided to try to make the marriage work because he loved her.

Around 5:00 p.m. on Friday, March 2, the Appellant left work, picked up his daughter at Allen's apartment, and took the baby to the victim's apartment. He said that he was not drinking and that he and the victim were not arguing. The Appellant said that he and the baby went to Sergeant Phillips's house and stayed until around 9:00 p.m. He then took his daughter back to Allen's apartment.

The Appellant said that after he dropped off the baby, he went to the victim's apartment. Rose was there with some friends, but the Appellant did not know if Sergeant Chase was at home. The victim and McBride were at a liquor store. The Appellant said that he took a shower and put on basketball shorts. By the time he finished dressing, the victim and McBride had returned with half a gallon of gin. Around 9:30 p.m., the Appellant started drinking. He conceded that he was a "heavy drinker" and that he drank on a daily basis. That night, he was drinking from a sixteen-ounce glass that was filled "a little more than halfway." He did not mix anything with the liquor and drank around three glasses. The Appellant said that the victim sat on his lap while he drank. McBride, Rose, Pittman, and two white men were playing spades while sitting at a table in the common area.

The Appellant said that McBride asked the Appellant to go to a club with him. The Appellant initially agreed and asked the victim if she wanted to go. She did not want to go, so the Appellant decided to stay with the victim to avoid an argument. He said that he knew the victim wanted to spend time with him.

The Appellant said that Rose and the two white men left after they finished their card game. The Appellant, the victim, and McBride went into the victim's room. McBride tried to talk the Appellant into going to the club with him and asked the Appellant what he should do if he had a problem at the club. The Appellant pulled the gun case from underneath the victim's bed and offered to let McBride take the gun to the club, but McBride declined. The Appellant said that he had the gun for protection. He and the victim had been threatened by her previous boyfriend.

Around 10:30 p.m., McBride and Pittman left.  The Appellant said that he and the victim sat on her bed.  He drank gin straight from the bottle, and he and the victim talked about the basketball game they planned to attend the next day.  He and the victim were not arguing.  As they were talking, the Appellant fell asleep.  He awoke when the victim threw cold water on him.  He sat up in bed, confused, and saw the victim standing to his right.  She was screaming that the Appellant needed to spend time with her.  The Appellant said that he was irritated and "pissed" about having water thrown on him but that he remained calm.  He maintained that he normally remained calm when he and the victim argued.  The victim told him to get up so she could change the sheets, and he complied.

The Appellant said after the sheets were changed, he fell back on the bed and tried to go back to sleep, but the victim grabbed the waistband of his shorts and pulled him off the bed.  The Appellant called her a "b[*]tch" and told her she was stupid.  They argued, and the Appellant told her that he wanted a divorce.  The victim responded that he could not leave because they were married.  The Appellant did not recall seeing Sergeant Chase come out of her room during the argument.

The Appellant said that he was intoxicated and was "pissed off" and "in a bad mood" because he had been awakened by having cold water thrown on him.  He removed his wedding ring and threw it on the bed.  He then removed the wedding rings from the victim's finger and put them on his pinkie finger.  He said that he wanted her to know he was serious about leaving her.  The victim was upset and started "mushing" the Appellant in his face and grabbing his shirt.  He said that the "mushing" did not hurt but was irritating.  He said that he remained calm and began gathering his belongings.  He left the victim's room and put his uniform and wallet on the table in the common area.

The Appellant said that the victim shut the door to her room.  He knocked on the door because he had "stuff" in her room.  He was mad and told her to "open the f[*]ckin door."  When she refused, he kicked in the door and went into the bedroom.  The victim tried to hide the Appellant's cellular telephone, but he "snatched" it from her.  He took the gun case and a box of bullets to the kitchen table and then began looking for the keys to his vehicle in the victim's bedroom.  During his search, the victim left the bedroom.  He heard the front door of the apartment shut and thought the victim intended to break the windows in his vehicle.  He left the bedroom to see what she was doing and saw that the gun case was missing from the kitchen table.  Because of the victim's prior threats, the Appellant thought she intended to kill him.

The Appellant ran outside and saw the victim at the bottom of the stairs, trying to open the gun case.  He ran down the stairs and grabbed the case from her.  She ran back into the apartment, and the Appellant followed her.  The Appellant said that "because of everything that happened prior to the gun getting involved I lost it."  He said that he did

not leave because he was mad, drunk, and not thinking clearly. He did not recall that the gun had jammed or clearing the jam. He recalled that someone ran from the bathroom, but he did not know it was Sergeant Chase. He said he did not know that he had shot the victim until he saw her in the bathtub and realized that she was dead.

The Appellant said that he saw the victim was dead and that "the momentum left [his] body." He began shaking and feeling weak and dropped the gun in the tub. He took the victim's car keys from the tub, grabbed his cellular telephone, and left the apartment. The Appellant explained that he did not call 911 because he was "out of it, . . . she woke me up out of my sleep, everything happened so fast and now I killed her." He found it difficult to believe he had killed his wife and wanted to think it was not true.

The Appellant said that after the shooting, he went to Allen's apartment to see his daughter. On the way, he drove recklessly, running red lights and stop signs. He said that when he arrived at Allen's apartment, he was in denial and began crying and shaking. Allen reached for him, but he told her not to touch him, said that he did not want to get her involved, and informed Allen that he and the victim had "gotten into it, she tried to kill me and I killed her."

The Appellant said that he wrote a letter to his daughter. In the letter, the Appellant said that he "was to gutter for these motherf[*]ckers out here. By that, that's slang; you know, I kept it too honest, I was too real, so." The Appellant also told his daughter that he loved her and to make her mother proud. Allen asked him to stay, but he refused. After he left Allen's apartment, he got on the interstate. He nearly hit a guardrail and a tree, then he pulled to the side of the interstate and went to sleep.

The next morning, he received a call from one of the victim's friends, who urged him to turn himself in to the police. He responded that he could not. He decided to call Sergeant Phillips for advice, but, when he called, he spoke with a detective. The detective said that he needed to talk to the Appellant and asked if the Appellant knew why. The Appellant responded, "I killed my wife, she tried to kill me," and disconnected the call.

The Appellant said that when he was stopped by troopers in North Carolina, he was on his way to visit his mother. After being incarcerated in North Carolina for two days, the Appellant forced himself to accept that he had killed the victim.

The Appellant said that after the victim woke him, he tried to stay calm, noting that "without being intoxicated I'm a grumpy person when I wake up, that's just me." The Appellant acknowledged that he should have left the apartment. He said that he got "caught up in the heat of the moment" and that he "snapped." He apologized to Sergeant

Chase "for putting her in the middle of a situation like that." He also apologized to the victim's family.

On cross-examination, the Appellant said that he joined the Army immediately after he graduated high school in 2009. He met Allen at the end of March 2011. At that time, he had not met the victim. The Appellant found out that Allen was pregnant after their romantic relationship ended.

The Appellant met the victim on a work detail in June 2011. At first, they had a "brother/sister relationship," but the relationship eventually became romantic. The Appellant acknowledged that he never told the victim that his relationship with Allen had ended because of his affairs. The Appellant said that when he began dating the victim in July 2011, he was living in the barracks at Fort Campbell. The victim moved into The Groves at the end of September 2011, but he did not move out of the barracks. He said that although he and the victim did not share an apartment, they stayed together almost every night.

The Appellant said that as his relationship with the victim progressed and as the baby's due date grew nearer, the victim began wanting more attention. He said that when she became violent with him, he would laugh in an attempt "to defuse the situation."

The Appellant explained that leaving the victim was difficult because they worked together and saw each other every day. He conceded, however, that nothing really prevented him from leaving the relationship. He acknowledged that he could have requested that one of them be transferred to another department. He admitted that he was "enjoying the relationship."

The Appellant said that the victim cut him three weeks before their marriage. Around the middle of February 2012, the victim threatened "on her son's life" to kill the Appellant if he tried to leave her. Nevertheless, he proposed to her on February 14. The Appellant said that immediately after he and the victim were married, they went to Arkansas and spent time with her family, including her son. Nothing unusual happened in the week preceding the shooting. One night, he spent a couple of hours with his daughter. The victim did not complain, but the Appellant could tell from her face and body language that "she had a problem with it."

The Appellant said that the victim stopped by Sergeant Phillips's residence while the Appellant and his daughter were there. He said that he trusted the victim with his daughter.

The Appellant agreed that even though he drank heavily, especially on weekends, he had never lost control before the shooting. He conceded that the alcohol was not the

sole reason he shot the victim. The Appellant agreed "that it wasn't any escalation of anything she had done that week, because she hadn't done anything."

When asked if he feared for his life immediately before the shooting, the Appellant said, "It's more of like – you know, I was waken up out – I was awaken up out of my sleep, I – I'm trying to leave; why are you – like why you doing all – like why you bothering me, I'm trying to leave; why you trying to prevent me from leaving?" The Appellant stated that "the only way for you to know what I was feeling that night is you would have to be drunk and asleep drunk and somebody throw cold water on you, then stand over you screaming after they rudely wake you up out of your sleep to know how I was feeling that night." He said, "My life was difficult at that time; I was stressed out." The Appellant said that he did not see anyone else when he was outside the apartment.

The Appellant said that he decided to shoot the victim's front door when he put the magazine in the gun but immediately clarified that "[i]t wasn't a decision it was a reaction." He shot the door ten or eleven times, but it would not open, so he kicked it in. He shot at the victim as she ran away. He said that he fired "at the person that threatened [his] life." He did not recall hearing the victim beg for her life. He said that he was "pissed off" and "drunk." He did not recall Sergeant Chase urging him to calm down and acknowledged that he was "out of [his] head with that rage and alcohol." He conceded that he fired the gun until he ran out of bullets. When the gun was empty, he dropped it in the tub; he denied tucking the gun underneath the victim. He acknowledged that he must have ejected the magazine from the gun. He thought the victim was dead at that point because she was not moving. He did not know why the victim had her car keys with her in the tub. He thought the victim had his keys in her boot to prevent him from leaving.

The Appellant said that after the shooting, "half of me knew that what had just happened was true and the other half was trying to tell me that it was a bad dream." He acknowledged that he did not attempt to give aid to the victim or call 911.

On redirect examination, the Appellant said that he was not "used to being in an abusive relationship" and that the victim "was more jealous than the average female." After the victim cut him, he laughed to defuse the situation, not because he thought it was funny. He said that he had no financial ties to the victim and that he stayed because he loved her. He stated, "I tried too hard to make it work." He and the victim ended their relationship approximately four times, but each time, they reconciled the next day.

The Appellant said that after their marriage, he and the victim asked their superior officers if one of them would be transferred, but they were told that no transfer was forthcoming. The Appellant said that he wanted a transfer so he and the victim could

have some time apart. The Appellant said that if he had told his superior officers about the trouble in his relationship, his advancement in the military could have been affected.

The Appellant said that before his daughter was born, he normally got off work, went to the gym, and then went to see the victim. After the baby's birth, he spent time with his daughter, which resulted in his spending less time with the victim. The Appellant took his daughter to the victim's apartment on March 2 in an attempt to spend time with both of them.

The Appellant said that he thought the victim was trying to start a fight by throwing water on him. The Appellant acknowledged that he called the victim names, conceding that he was "pissed off."

The Appellant said that he had an Xbox video game system and some shoes and clothes at the victim's apartment. He usually kept his keys in a drawer. When he decided to leave the apartment, he began looking for his keys and heard the front door shut. He noticed that the gun case was missing and thought the victim was going to kill him. He said that he was still intoxicated, had just been awakened, and felt that his life had been threatened. He acknowledged that he did not call 911 after the shooting, noting that his "state of mind was a little mix of anger, excitement, I was intoxicated, just been woken up out of my sleep." He took the victim's car because he could not find his keys.

Dedra Allen testified that she and the Appellant met at Fort Campbell at the beginning of 2011 and dated approximately six months. She became pregnant in July while they were still dating. She told the Appellant about the pregnancy, and he was "happy." Allen learned that the Appellant had "cheated on" her with the victim and ended her romantic relationship with him around the end of July. Thereafter, he began dating the victim. Allen said that she wanted the Appellant to be involved in the baby's life and to take her to doctors' appointments because she did not have a vehicle.

Allen said that during her pregnancy, she and the Appellant got along, had no problems, and were friends. He did not bring the victim around her but occasionally discussed his relationship with the victim with Allen. Allen stated that the Appellant was at the hospital when their daughter was born. She did not want the victim around her daughter and did not know the Appellant had married the victim until after the victim's death.

Allen said that she saw the Appellant around 10:00 a.m. on March 2. He asked to keep the baby for a few hours after work that day. He picked up the baby around 5:00 p.m. and brought her back to Allen around 9:00 p.m. At that time, the Appellant had not been drinking.

Allen said that the Appellant called a few minutes after midnight. He was crying and asked to "come see [his] daughter for the last time." Allen asked what was wrong, and the Appellant responded that "he messed up." The Appellant came to her apartment, walked in, paced the floor, and was shaking. He was "bawling tears" and appeared to be scared, nervous, and in shock. She smelled alcohol and again asked the Appellant what was wrong. He responded that he and the victim got into an argument, that he tried to leave, and that she would not allow him to leave. He said that "she tried to kill him and he shot her." Allen tried to get the Appellant to stay at her apartment, but he said he wanted to see his mother in South Carolina.

On cross-examination, Allen agreed that she told the police the Appellant said the victim got mad when he told her he wanted to be with his daughter, they argued, and the victim started fighting him. When the Appellant tried to leave, she pulled out his gun. He took the gun and shot her.

Allen said that she called 911 immediately after the Appellant left her apartment. She was concerned about the victim because the Appellant had not said whether the victim was alive or dead.

Twan McBride testified that he and the Appellant worked together in the Army. McBride and the victim were close friends. When the Appellant and the victim began dating, their relationship was good, and they seemed happy. McBride said that the couple occasionally argued but that the arguments were "kind of the usual" and that they quickly reconciled. They argued more frequently after the Appellant began spending more time with the baby and less time with the victim. The Appellant seemed excited to be a father. McBride said the victim did not want to prevent the Appellant from seeing his child, but she wanted him to bring the baby home with him instead of spending time at Allen's apartment.

McBride said that he never saw the victim hit the Appellant, but he saw a photograph of a cut on the Appellant. McBride talked to the Appellant and the victim about the cut, and they said they planned to attend counseling. McBride said that he had seen the Appellant mad on only one occasion and that the Appellant usually maintained his self-control. After arguing with the victim, the Appellant occasionally stayed in the barracks instead of the victim's apartment.

McBride said that on the night of the shooting, the Appellant, the victim, and he were supposed to go to a club. The victim did not want to go, and the Appellant decided to stay home to avoid an argument.

On cross-examination, McBride acknowledged that the Appellant "knew how to push [the victim's] buttons" and "thought it was cute to do so." The Appellant and the victim often fought and then "made up."

McBride said that when he left the apartment between 10:30 and 11:00 p.m., the Appellant and the victim had not been arguing. He acknowledged that the Appellant, the victim, and he were drinking alcohol that night.

On redirect examination, McBride acknowledged that the victim "push[ed the Appellant's] buttons," too. He said that the Appellant and the victim's arguments began before the baby was born.

Megan Orlandi testified that she was an "E-4, specialist" and that she met the Appellant and the victim at Fort Campbell. The victim talked with Orlandi about her relationship with the Appellant and her jealousy of the Appellant's child. Orlandi said that a couple of weeks before the shooting, she heard the Appellant and the victim yelling in the motor pool parking lot. She saw the victim push the Appellant "a little bit." The Appellant put up his hands and tried to walk away.

Orlandi said that the victim told Orlandi that she had cut the Appellant. While the victim was explaining, the Appellant approached them and showed Orlandi the cut. Around the same time, Orlandi saw the Appellant with a black eye. Orlandi opined, "I think they were both joking around with it. They didn't take anything real serious, especially the fighting." Orlandi noted that the Appellant was "usually the calm one of the situation" and that the victim had acknowledged the Appellant "would never put his hands on her." Orlandi said that the Appellant never got "out of hand" with the victim and that "[i]t was always [the victim]." When asked if the victim had a temper, Orlandi said that "she was a feisty soldier, but she was also a good soldier."

On cross-examination, Orlandi said that she went to lunch with the victim and the Appellant a couple of times but that she never visited their home. She did not know how the Appellant treated the victim when Orlandi was not watching them. Orlandi said that she never saw the victim do anything toward the Appellant that was "life threatening."

Deon Davson testified that he was in the military with the Appellant and the victim. The Appellant and the victim each told Davson about issues in their relationship. The victim talked with Davson about the Appellant's child with another woman. Davson said that the victim did not reveal her emotions about it and that he advised her that if she chose not to leave the relationship, she should "leave the situation alone." The Appellant talked with Davson about the difficulties of dealing with his relationship with the two women.

Davson said that a few months into their relationship, the Appellant and the victim told him that they had "a dispute" that weekend. Davson thought "it was just like a regular relationship argue, fuss and makeup." In early 2012, he learned that the Appellant had been cut during an argument.

Davson said that the Appellant was a good soldier, that he was calm, and that he did not try to cause trouble. The victim was also a good soldier.

At the conclusion of the proof, the jury found the Appellant guilty of first degree premeditated murder, and the trial court sentenced him to life imprisonment. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction and the adequacy of the trial court's jury instruction regarding premeditation.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A person "acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the

result." Tenn. Code Ann. § 39-11-302(a). Tennessee Code Annotated section 39-13-202(d) defines "premeditation" as "an act done after the exercise of reflection and judgment."

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

The Appellant concedes that he shot and killed the victim but contends that he did not act intentionally or with premeditation. In support of this contention, the Appellant notes that the victim was unarmed only because he disarmed her. He further notes that he had never threatened the victim; however, she had threatened him in the past. He contends that he made no attempts, either before or after the shooting, to conceal the offense. He asserts that he was not calm before, during, or after the offense.

In response, the State maintains that the evidence was sufficient to establish that the Appellant acted with premeditation and that the jury correctly found that the Appellant committed first degree murder. The State notes that the Appellant used a deadly weapon and fired repeatedly at an unarmed victim while she was retreating and

begging for mercy. Additionally, the State maintains that the Appellant was calm enough to clear his gun after it jammed twice and that two witnesses saw the Appellant calmly walking away from the apartment building immediately after the shooting.

In the light most favorable to the State, the proof adduced at trial revealed that the Appellant and the victim had a contentious relationship that was made more difficult because the Appellant was expecting a child with another woman. Several witnesses, including the Appellant, testified that during previous arguments, the victim hit the Appellant but that neither of them seemed to think it was serious. The Appellant even acknowledged that he was not hurt and did not feel threatened; at most, he was irritated. Phillips asserted that the Appellant never seemed afraid of the victim and that the cut was "nothing." Orlandi said that the victim and the Appellant "jok[ed]" about it. The Appellant and the victim often fought and "broke up," but they soon reconciled. McBride said that the Appellant and the victim knew how to "push" each other's "buttons."

The Appellant acknowledged that the victim did not do "anything" during the week preceding the shooting. On March 2, after the Appellant kept his daughter for a few hours and got a haircut, he and the victim drank alcohol and played cards with friends at the victim's apartment. They did not argue, and the victim sat on his lap as he drank. Before Pittman and McBride left to go to a club, the Appellant showed them the gun he kept underneath the victim's bed. Thereafter, the Appellant and the victim went to her bedroom and talked until he fell asleep or passed out.

According to the Appellant, the victim awakened him by throwing cold water on him and demanding that she spend time with him. He said that after she changed the sheets, she prevented him from falling back asleep by pulling him out of bed. The Appellant called the victim names and asked for a divorce. He removed his wedding ring and took her wedding rings. The Appellant said that he was "pissed off" and "in a bad mood" because he was intoxicated and had been awakened by the cold water. They argued, and the Appellant said she "mush[ed]" his face, which did not hurt but was irritating.

The Appellant began gathering his things to leave and piled them on a table in the common area. The victim shut and locked her bedroom door. When she refused to open it, he kicked it in. He looked for his keys and heard the front door shut. The Appellant saw that his gun case was missing and followed the victim. He found her in the stairwell and took the gun case from her. She ran back to the apartment and locked the door. The Appellant said that while he was in the stairwell, he removed the gun from the case, loaded it with a magazine that held thirty-three bullets, and followed. He shot the front door ten or eleven times then kicked it in and followed the victim through the apartment, shooting at her. She fled into Sergeant Chase's room, and the two women hid in the

bathroom. The victim begged for her life. The Appellant kicked in the door to the bathroom, and Sergeant Chase escaped. As the victim crouched defenselessly in the bathtub, the Appellant shot her multiple times, emptying the magazine. The victim's neighbors who heard the shots testified that two to five minutes elapsed from the first shot to the last shot. He claimed that he dropped the gun in the tub; however, the proof adduced at trial revealed that the gun and the magazine, which had been ejected from the gun, were placed partially underneath the victim with her hand on the gun. Day and Foster saw the Appellant walking, not running, from the scene of the crime. Dr. Deering testified that the victim's death was caused by multiple gunshot wounds and that the injuries to her hands and wrists could have been defensive wounds.

We agree with the State that from the foregoing, a reasonable jury could have found beyond a reasonable doubt that the Appellant committed first degree murder.

## B. Jury Instructions

Finally, the Appellant argues that the jury instruction regarding premeditation was not sufficient to "satisfy state and federal constitutional rights to due process and trial by jury." Specifically, he contends that the jury instructions were written "at a level far above the reading level of the average citizen and to expect them to parse the sentences [regarding premeditation] as well as those who wrote them is simply too much to assume." In response, the State contends that the instruction was a correct and complete charge of the law and that counsel's failure to object to the instruction at trial resulted in waiver of the issue.

First, we will address whether the Appellant properly preserved the issue for appeal. The record reveals that the Appellant did not object to the jury instruction at trial but did raise the issue in his motion for new trial. Generally, "a defendant's right to challenge an erroneous jury instruction is not waived by his failure to make an objection at trial." State v. Bowman, 327 S.W.3d 69, 93 (Tenn. Crim. App. 2009) (citing State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn. 1996)). However, the Appellant does not argue that the trial court's instruction to the jury was incorrect. Instead, citing Microsoft Word and Wikipedia,[2] the Appellant contends that the instruction on premeditation was simply too difficult for the average juror to understand. He contends that the instruction was written at a collegiate level but that the average American reads at only a seventh or eighth grade level. We conclude that the Appellant has woefully underestimated the ability of jurors. The instruction was not erroneous; thus, the Appellant was required to

---

[2] The Tennessee Court of Appeals has found that Wikipedia, which is a "source [that] is open to virtually anonymous editing by the general public," is not persuasive authority. English Mountain Spring Water Co. v. Chumley, 196 S.W.3d 144, 149 (Tenn. Ct. App. 2005).

raise his objection at trial to preserve the issue. He failed to do so; therefore, the issue is waived.

Nevertheless, Tennessee Rule of Appellate Procedure 36(b) provides in pertinent part that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time[.]" See also Tenn. R. Evid. 103(d); State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000); State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

Adkisson, 899 S.W.2d at 641-42 (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations and citation omitted).

Our review of the record reveals that no clear and unequivocal rule of law was breached and consideration of the alleged error is not necessary to do substantial justice. Therefore, we need not examine the issue for plain error.

### III. Conclusion

Finding no error, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 23 -